[Nos. D045154, D045579. Fourth Dist., Div. One. July 19, 2006.]

BENETTA BUELL-WILSON et al., Plaintiffs and Respondents, v. FORD MOTOR COMPANY et al., Defendants and Appellants.

526

## COUNSEL

Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., William E. Thomson, Eileen M. Ahern, Theodore B. Olson and Paul DeCamp for Defendants and Appellants.

Kirkland & Ellis, C. Robert Boldt, Christopher Landau, Erin Morrow; National Chamber Litigation Center, Robin S. Conrad and Amar D. Sarwal for the Chamber of Commerce of the United States of America as Amicus Curiae on behalf of Defendants and Appellants.

Mayer, Brown, Rowe & Maw and Donald M. Falk for the Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Defendants and Appellants.

O'Melveny & Myers, Brian D. Boyle, Matthew M. Shors, Charles E. Borden and Arthur W. S. Duff for the Alliance of Automobile Manufacturers as Amicus Curiae on behalf of Defendants and Appellants.

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Jerome B. Falk, Jr., Steven L. Mayer, Keith D. Kessler; Hancock, Rothert & Bunshoft, Paul D. Nelson, Paul J. Killion, Jacqueline G. Elliopulos, Leslie Kurshan, Michael J. Dickman; Schoville & Arnell, Dennis A. Schoville, Louis G. Arnell and James S. Iagmin for Plaintiffs and Respondents.

## OPINION

**NARES, J.**—Benetta Buell-Wilson (Mrs. Wilson) brought this action against Ford Motor Company (Ford) and Drew Ford (Drew)[1] as a result of the rollover and roof crush of her Ford Explorer (Explorer) that left her a paraplegic. Mrs. Wilson's husband Barry Wilson (Mr. Wilson) brought a claim for loss of consortium against Ford and Drew. A jury found in favor of Mrs. Wilson and Mr. Wilson (together the Wilsons), finding that (1) the Explorer was defectively unstable; (2) the Explorer was not crashworthy due to a defect in the roof; (3) Drew failed to warn the Wilsons that the Explorer was defectively unstable; and (4) Ford and Drew failed to warn the Wilsons of the danger posed by the defect in the roof. The jury awarded Mrs. Wilson $109,606,004 in damages for her injuries, consisting of $4,606,004 in economic damages and $105 million in noneconomic damages, and awarded Mr. Wilson $13 million for his loss of consortium. The jury also found that Ford acted with "oppression, fraud or malice" and awarded the Wilsons $246 million in punitive damages. The court later reduced Mrs. Wilson's total compensatory damages award to $70 million, resulting in an award of $4,606,004 in economic damages and $65,393,996 in noneconomic damages. The court reduced Mr. Wilson's loss of consortium damages to $5 million. The court reduced the punitive damages award to $75 million, a one-to-one ratio to the Wilsons' total reduced award of compensatory damages.

---

[1] Ford Motor Company refers to itself and Drew Ford collectively as "Ford," except where necessary to distinguish between the two. Accordingly, we do the same in this opinion.

On appeal Ford asserts (1) it is entitled to a new trial because the court erroneously admitted evidence about stability problems with a predecessor vehicle, the Ford Bronco II (Bronco II), and erroneously excluded evidence of the Explorer's "real-world" safety record and comparative data; (2) the noneconomic portion of the compensatory damages award was excessive and an unconstitutional violation of Ford's due process rights; (3) punitive damages were improperly awarded because (a) at most the Wilsons proved that "reasonable people could disagree regarding" the design decisions Ford made, and (b) California's punitive damages law is unconstitutionally vague as applied; and (4) the punitive damages award was excessive and the product of improper considerations. We granted permission to the Chamber of Commerce of the United States of America (the Chamber), the Alliance of Automobile Manufacturers (AAM) and the Product Liability Advisory Council, Inc. (PLAC), to file amicus curiae briefs to support Ford's contentions on appeal.[2]

We hold that (1) the award of noneconomic damages to Mrs. Wilson, as reduced by the trial court, is excessive under California law, is the product of "passion or prejudice," and must be reduced to $18 million; (2) the reduced award for loss of consortium in the amount of $5 million is reasonable and is affirmed; and (3) the award of punitive damages is excessive, violates federal due process limitations, and must be reduced to $55 million, a ratio of approximately two to one to the total compensatory damage award, after our reduction, of $27,606,004 ($4,606,004 in economic damages + $18 million in noneconomic damages + $5 million for loss of consortium). We issue a remittitur conditioning affirmance of the judgment on the Wilsons' agreement to those reductions. Thus, if the Wilsons accept the remittitur, the total judgment will be reduced to $82,606,004 ($4,606,004 in economic damages + $18 million in noneconomic damages + $5 million in loss of consortium + $55 million in punitive damages). We reject the remainder of the arguments made by Ford and amici curiae.[3]

---

[2] Ford separately appealed the underlying judgment and the court's rulings on posttrial motions. On January 26, 2005, by stipulation of the parties, these two appeals were ordered consolidated.

[3] The Wilsons also appealed the judgment, but have voluntarily dismissed their appeal. Following briefing in this matter, the Wilsons filed a motion to strike allegedly false statements made in Ford's reply brief. We ordered the motion considered concurrently with the appeal. We deny the motion to strike, but note that in resolving this appeal we have not considered any statements that are not supported by the record. The Wilsons filed a motion for judicial notice, requesting that we take judicial notice of the legislative history of the 1987 amendment to Civil Code section 3294, as well as portions of the legislative histories for unenacted Assembly Bill No. 2880, unenacted Assembly Bill No. 2582, and pending Senate Bill No. 1429. We grant this unopposed request.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Accident*

At around 5:00 p.m. on January 19, 2002, Mrs. Wilson, a married 46-year-old graduate student and mother of two, was driving her 1997 four-door Explorer within the speed limit on Interstate 8 near Alpine, California. The road was dry and sloped slightly downhill.

Suddenly, Mrs. Wilson saw what appeared to be a metal object break loose from a motor home in front of her and bounce directly toward her windshield. As she swerved to avoid the object, the wheels on the passenger side lifted from the road, and the Explorer went out of control. The vehicle fishtailed multiple times across lanes and rolled four and a half times, coming to rest on its roof on the road's shoulder. Ford conceded at trial that Mrs. Wilson bore no fault for the accident.

As the Explorer rolled, the roof's pillars and rails crumpled, and the roof crushed down more than 10 inches, causing severe injuries to Mrs. Wilson. Inside the vehicle, she hung upside down from her seatbelt, in "crushing . . . unbelievable pain," gasping for breath and feeling as if her life were fading away. Motorists stopped to assist and struggled to flip the vehicle, and rescue crews cut the roof open to remove her. An ambulance took her from the scene to a life flight helicopter, which flew her to Sharp Memorial Hospital (Sharp) trauma center.

### B. *Mrs. Wilson's Injuries*

### 1. *Physical injuries*

The compressive forces from the collapsing roof fractured and severed Mrs. Wilson's spine at the T12 level, where the thoracic and lumbar regions meet. She will never recover sensation or function below the level of that injury. She also suffered facial injuries, fractured ribs, a cut spleen that caused internal bleeding, a fractured leg and torn PCL and ACL ligaments in both knees, causing bilateral knee dislocations.

In addition to the vertebral fractures, the spinal sac was damaged, causing leaking of cerebral spinal fluid, and portions of the spinal cord and nerve root were pulverized. Doctors inserted metal screws and rods into her back to stabilize her upper body. After almost two weeks, she was transferred to Sharp's rehabilitation center, where she spent another two and a half months.

Mrs. Wilson's resulting paraplegia ended her active life and forced her to painfully relearn basic aspects of daily living, some of which she will never

regain. She lives in severe and constant pain that will increase over time. Her accident left her with no sensation from the waist down, except "phantom pain"—a constant burning sensation below her ribs. Above her waist, she suffers constant pain, feels painful pressure on her ribs from the rods in her back, and has intermittent spasms of stabbing pain.

Medication can provide temporary pain relief, but the strong medication needed has serious side effects. It causes her to lose alertness, which makes it impossible to drive. It interferes with her ability to communicate socially. It makes her unsteady in her wheelchair. She also runs the risk of becoming addicted to the medication. There is a constant conflict between efforts to reduce her pain and the debilitating side effects of the medicine itself.

The spinal injury caused a total loss of bladder and bowel control. She must now catheterize herself multiple times daily. Her feces must be manually extracted. In addition to the emotional pain and humiliation from losing control over her bodily functions, she suffers recurring urinary tract infections, which expose her to a potentially fatal kidney disease. Mrs. Wilson is allergic to commonly prescribed medications, including sulfa and penicillin, and her chronic use of antibiotics to fight infections has caused resistance to other drugs.

Mrs. Wilson also suffers severe bruising, which takes months to heal due to diminished circulation in her lower body. Her feet swell and are susceptible to cracking and bleeding. The constant grinding of her shoulder joints from wheeling her wheelchair has caused shoulder problems, which will worsen over time. She suffers disfigurement, with one leg smaller than the other and large surgical scars across her back.

### 2. *Mental and emotional injuries*

Before the accident, Mrs. Wilson was an active, athletic, outdoors woman, with a black belt in martial arts. She often camped and hiked with her family, backpacked with Girl and Boy Scouts, helped with the San Diego Tracking Team, and did projects at Mission Trails Regional Park. She and her husband took dancing lessons, traveled and took walks.

She no longer can engage in any of the active lifestyle she once enjoyed, including swimming, skiing, snowboarding, dancing, backpacking and walking. Mrs. Wilson was finishing her masters degree in education and was about to start a second career as a teacher. These plans also have been indefinitely delayed and it is unclear whether they are now possible.

Mrs. Wilson is unable to visit all the rooms in her home—including her own bedroom—because they are inaccessible to her. She and Mr. Wilson must sleep in their laundry room.

She has changed from a giving, enthusiastic, independent person who took joy in aiding others, to being dependent on others for almost every aspect of her life. Her husband and children are now her caregivers.

### C. *Mr. Wilson's Loss of Consortium*

The injuries to his wife dramatically changed Mr. Wilson's life as well. The Wilsons no longer share the physical relationship they had prior to the accident. Instead, he is now her caregiver and must assist her with the most personal of care, including showering and catheterizing her. He assists her in transferring in and out of her wheelchair and worries that she may fall if she tries to transfer on her own. Several times per night, he wakes to turn his wife over in bed so that she will not get bedsores.

Mr. Wilson has had to decrease his work schedule as an attorney to assist his wife during the day and accompany her to medical appointments and therapy. He performs the household work that his wife can no longer do. The Wilsons spend most of their time trying to accomplish the mundane chores of daily life. Every day Mr. Wilson shares his wife's constant pain, frustration and anxiety in living with her injuries.

### D. *The Explorer's Defects*

The Wilsons submitted evidence at trial that the accident and resulting injuries were caused by two independent defects in the 1997 Explorer. They established that the Explorer's design was dangerously unstable and prone to rollover due to its overly narrow track width and high center of gravity. They also established that the Explorer's roof was inadequately supported and defectively weak, so that it readily crushed into the passenger compartment when subjected to the forces inherent in a foreseeable rollover.

Ford has not challenged on appeal the sufficiency of the evidence supporting the jury's finding that the Explorer was defective on either of these grounds.[4] We therefore review the evidence in the light most favorable to the judgment, disregarding contrary evidence submitted by Ford. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053 [68 Cal.Rptr.2d 758, 946 P.2d 427].)

### 1. *Stability defects*

Long before the Wilsons purchased their Explorer, Ford's engineers knew that the vehicle's design was unstable and prone to rollover in emergency maneuvers due to its high center of gravity and narrow track width. Ford had

---

[4] Ford does assert that the court erroneously admitted evidence that supported the jury's finding on liability and erroneously excluded evidence that supported its defense. However, as is discussed, *post*, those evidentiary rulings were not an abuse of discretion.

known for decades the importance of vehicle stability in emergency maneuvers. It knew that on flat, dry pavement, a car or truck should slide out, rather than roll.

The Explorer was derived from the Bronco II and evidence of its development history was presented to the jury to show them how and why the Explorer's instability defect came to exist. In 1981, two years before the Bronco II's introduction, Ford measured the stability index (SI) of its competitor, the Jeep CJ7, which had a widely reported rollover problem. The SI is the average of front and rear track width, divided by the center of gravity height. The higher the SI rating (i.e., the wider the track and lower the center of gravity), the more stable the vehicle. The Jeep's SI was 2.04. The Bronco II's SI was less, measuring 1.86. The Bronco II was so unstable it would roll over at only 30 mph on Ford's test track. Ford engineers proposed improving its stability index by widening its track width. Because doing so would have delayed the vehicle's release date and impacted profits, that proposal was rejected by management.

Ford knew that people were being seriously injured in Bronco II rollovers when the Explorer was being developed. In April 1989, a year before the Explorer release date, Ford executives objected to and tried to stop the release of a damaging Consumer Reports article on Bronco II instability.

Regarding these efforts, Jerry L. Sloan of Ford's public affairs office wrote: "We think going in we were in deep trouble regarding our rollover rates . . . . [¶] . . . Our rollover rate is three times higher than the Chevy S-10 Blazer. . . . [T]he [Fatality Analysis Reporting System (FARS)] data put us in a bad light. . . . [¶] . . . [¶] We think, however, that we have clouded their minds . . . ."

Instead of making design improvements in stability for the Explorer, Ford utilized the Bronco II platform. The Explorer had almost exactly the same track width, high engine mount and elevated center of gravity as the Bronco II, which caused the same instability problems. Over half the parts for the four-door and 80 percent for the two-door Explorer were carried over from the Bronco II.

Ford's design engineers repeatedly requested Ford to widen the track width and lower the center of gravity on the Explorer to increase its stability. However, management declined to do so. As acknowledged by Robert Simpson, a program manager for the development of the Explorer, this was because of "the . . . investment that Ford had sunk into the Explorer," and, as the Wilsons' expert, Dr. David Renfroe, explained, it was also because its "directive was to meet Job 1 [the release date]." Dr. Renfroe also explained

that "the engineers were proposing to make [stability index] changes to be consistent with their standards and they were prevented from doing that by the management."

Unable to pass the Consumers Union on-track stability test because the Explorer was rolling over at under 45 miles per hour, Ford resorted to using computer simulations to show the vehicle's safety. Ford claimed the validation data for its computer results did not exist, precluding an expert from determining whether the Explorer actually passed the computer tests. The Explorer did pass the Consumers Union short-course test, but that test was designed to measure its handling, not stability.

The Explorer's instability was increased by Ford management's decision to utilize P235 tires that further raised the center of gravity, instead of the P215 tires specified and requested by its engineers to provide greater stability. Based upon his review of Ford internal documents, the Wilsons' expert, Dr. Renfroe, testified that Ford "knew when they made that decision that the vehicle was going to be more unstable and more likely to rollover in an accident avoidance maneuver, and they were . . . willing to accept the risk and take it to court, if necessary." Ford chose larger tires to fill a cosmetic gap between the wheel well and tire in order to present a more "robust" look. Ford's own analysis showed that Explorers equipped with P235 tires would have an SI of 2.08, less than the then-current 1987 Bronco II's SI of 2.15. With the P235 tires, the Explorer failed basic J-turn stability tests.

In 1988 a Firestone engineer, who was working with Ford to analyze the stability effect of different tire sizes on the prototype Explorer, wrote to Ford complaining about the vehicle's inherent instability: "Most importantly, the vehicle still has [two-]wheel lift no matter what tire is on it, 225/70, 215/75 or 205/75. So you're kidding yourself if anyone thinks going back to a base tire of 215/75 is going to solve anything."

Unable to pass stability tests with P235 tires, Ford executives in 1989 considered releasing the four-door Explorer on P225 tires in order to pass the Consumers Union test. Later, if the Explorer passed the test, Ford could release the vehicles with P235 tires, consistent with its marketing plan. In an internal Ford e-mail, this was referred to as a "strawman" that would "assure good performance in the [Consumers Union] Test and minimize any adverse Public Relations risk." Ford's decision to accept the risk of using the P235 tires is shown in an internal e-mail from Ford employee Roger Stornant to Charles White, a senior design engineer for the Ford Explorer: "OGC [the office of general counsel] is concerned we will be the only OEM [original equipment manufacturer] with a vehicle that has a significant chance of failing the CU [Consumers Union] test. I believe that management is aware of the potential risk w/P235 tires and has accepted risk."

Instead of using smaller tires, Ford executives decided in February 1989 to underinflate the P235 and P245 tires to 26 pounds per square inch (psi), as opposed to the tire's specification of 35 psi. Explorer owners were not informed of the need to underinflate the tires, nor were they told they were exposed to the risk of a rollover by complying with the tire's higher inflation specifications.

Ford had an opportunity to improve the Explorer's stability when it changed its suspension design for the 1995–1998 models. But again financial considerations prevailed and, according to a 1990 internal Ford document, Ford decided "not [to] take advantage of the fact that the engine could be lowered with a[n] SLA[5] type suspension. This decision was driven by early implementation and program cost." As a result, the Wilsons' 1997 Explorer was no more stable than the original model or its prototypes. According to the Wilsons' experts, the Explorer's inherent instability caused it to roll in response to Mrs. Wilson's emergency avoidance maneuver, resulting in her injuries.

### 2. *Roof strength defect*

As Mrs. Wilson's Explorer rolled, the roof crushed nearly a foot into the passenger compartment. The Wilsons' biomechanical expert, Dr. Anthony Sances, testified that Mrs. Wilson's spinal injury was caused by 1,000 to 2,000 pounds of force crushing down onto her shoulder. Dr. Frank Coufal, her neurosurgeon, confirmed that compressive force caused the spinal injury. The Wilsons' experts testified that a stronger roof would not have crushed and would have prevented Mrs. Wilson's injuries.

The Wilsons presented evidence that rollovers are relatively nonviolent events for the occupants when they are properly restrained and there is minimal roof intrusion, and occupants are killed or disabled only when the roof crushes inward.

The Wilsons also presented testimony from their engineering expert Stephen Forrest as to why the Explorer's roof was defectively weak. The evidence showed that Ford could have provided the Explorer with a roof that would not have crushed by using high strength steel, adding reinforcements, eliminating open sections such as the depressed weld groove, eliminating holes and/or using foam filling. Ford had used safer closed section front headers in other vehicles. These modifications would have cost about $20 per vehicle.

---

[5] "SLA" is short for "short/long arm" suspension, also known as "double wishbone" suspension.

### 3. *Ford and Drew's failure to warn the Wilsons of the defects*

The Wilsons testified that Ford and Drew did not provide notice of the Explorer's roof crush risk. The Wilsons also submitted evidence that Drew failed to warn them of the instability danger posed by inflating the P235 tires to the tire manufacturer's recommended psi. Drew did not disclose that their Explorer was equipped with larger LT235 tires instead of smaller P225 or P215 tires, nor that underinflation was required for the larger tires. The salesmen at Drew were unaware of an underinflation requirement. Although Ford directed its dealers to use no more than 26 psi in P235 tires, Drew never warned the Wilsons of this fact. Because of this, the Wilsons never knew to instruct attendants to underinflate the tires below the specified 35 psi when the vehicle was serviced.

The Wilsons testified they never would have bought the Explorer if the rollover and tire pressure risks had been disclosed.

### E. *Trial and Jury Verdict*

The jury deliberated for five days before reaching a verdict. It found nine to three that the Explorer had a stability design defect which was a substantial factor in causing the Wilsons' injuries. The jury found 11 to one that there was a crashworthiness design defect in the roof and that this defect was also a substantial factor in their injuries.

As to Drew, the jury found 10 to two that it failed to warn the Wilsons of the stability defect. They found in favor of Ford on this count. The jury found 10 to two that both Ford and Drew failed to warn the Wilsons of the Explorer's crashworthiness defect.

The jury awarded Mrs. Wilson $573,348 for past economic loss, $4,032,656 for future economic loss, $6 million for past noneconomic loss and $99 million for future noneconomic loss.

The jury found nine to three that Ford acted with oppression, fraud or malice. The court's poll of the jury confirmed each juror had found fraud, malice or oppression by clear and convincing evidence.

In a separate phase of trial, the parties presented evidence and arguments on punitive damages. During closing argument, counsel for Ford said: "It's impossible not to be angry at Ford, Ford Motor Company, for what decisions that in marketing and selling this Ford Explorer it knowingly put a defective product out on the market [*sic*] and caused the family tragedy that you see before you now. . . . [¶] . . . [¶] . . . We are sorry. I don't think—I know it

rings hollow, but I am going to say it anyway. We are sorry. We are sorry that we let you down. The engineers are sorry that they let the rest of the company down."

The jury awarded $246 million in punitive damages.

### F. *Posttrial Motions and Judgment*

Ford filed motions for new trial and judgment notwithstanding the verdict (JNOV).

The JNOV motion attacked the evidence supporting the punitive damages award. The court reexamined the evidence and concluded that the Wilsons had met their burden of producing clear and convincing evidence that Ford acted with malice, a conscious disregard for safety, and engaged in despicable conduct.

Ford's motion for new trial challenged the size of the compensatory and punitive damages award. The court found "the damages awarded are excessive," but also stated, "The Court does not find that the jury rendered its verdict due to passion or prejudice." The court conditionally granted a new trial unless the Wilsons consented to a reduction of Mrs. Wilson's compensatory damages award to $70 million, Mr. Wilson's loss of consortium award to $5 million and the punitive damages award to $75 million. Subtracting the jury's award of economic damages in the amount of $4,606,004, the court's remittitur left Mrs. Wilson with an award of noneconomic damages in the amount of $65,393,996.

In assessing the propriety of the amount of compensatory damages awarded to Mrs. Wilson, the court stated: "The evidence, in the Court's opinion, is insufficient to support a compensatory damage verdict in favor of [Mrs. Wilson] in the amount of $109,606,004. In reaching that finding and the other findings on the verdict on damages, the Court has weighed the evidence, including reasonable inferences therefrom, and is convinced from the entire record the jury clearly should have reached a different verdict on damages. That same evidence, however, . . . is sufficient to support a compensatory damage award in favor of [Mrs. Wilson] in the amount of [$70 million]."

In assessing the proper amount of punitive damages to be awarded the court stated: "In considering these factors, the evidence showed Ford had a pattern of deficient design regarding safety in favor of increased financial returns and was a result of the conscious disregard of Ford executives. That evidence was primarily adduced through Ford's own internal memoranda and

correspondence. This conduct was reprehensible and weighs in favor of punitive damages. [¶] The remittitur reduces the punitive damage award to a one-to-one ratio relative to the compensatory award. This is well within the second guidepost set forth by the Supreme Court. Even as reduced, the compensatory damage award is large. When compensatory awards are substantial, a ratio of [punitive damages] equal to the compensatory damages is within the limits of the due process guarantee. [Citation.] The punitive damages are fair and reasonable and proportionate to the amount of harm suffered by the [Wilsons]."

The Wilsons accepted the remittitur and an amended judgment was entered on September 3, 2004. Ford's timely appeals followed.

## ARGUMENT

### I. *EVIDENTIARY ISSUES*

#### A. *Bronco II Evidence*

Ford asserts it is entitled to a new trial because the trial court erroneously admitted evidence regarding the Bronco II vehicle. This contention is unavailing.

#### 1. *Background*

Ford contends the court erred in denying its motion in limine that sought to exclude as irrelevant "all evidence relating to the Bronco II and Ford's decision to cease manufacture of the Bronco II." In response, the Wilsons submitted evidence that the Explorer's relevant design characteristics were derived from the Bronco II and that Ford had knowledge of the rollover risk posed by that design.

The trial court denied Ford's motion, finding the Explorer's development was "intimately tied" to the Bronco II's development, as shown by Ford's internal documents.

Ford's motion for new trial asserted the court erred by allowing evidence of the Bronco II. The court rejected this argument, finding that the Wilsons "presented substantial evidence of the design carry-over from the Bronco II to the Explorer, evidence of the intermingling of the development and testing of the Bronco II and the Explorer and the similar source of rollover problems between the Bronco II and Explorer for the Court to find the two vehicles are substantially similar."

## 2. *Analysis*

" 'Broadly speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence.' " (*City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900 [122 Cal.Rptr.2d 802].) " ' "The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power." ' " (*Dorman v. DWLC Corp.* (1995) 35 Cal.App.4th 1808, 1815 [42 Cal.Rptr.2d 459].)

The court did not abuse its discretion in admitting evidence of similar design flaws in the Bronco II to those alleged to be at fault in the Explorer. The Wilsons' expert, Dr. Renfroe, testified that the Explorer and the Bronco II shared the specific dangerous design characteristics that created instability. In fact, it would have been impossible not to have evidence on the similarities of the Explorer and Bronco II's stability characteristics as Ford itself assessed the stability of the Explorer by comparison to the Bronco II.

Ford asserts that it was error to introduce evidence of the Bronco II because they were different vehicles, citing many differences in design. However, the evidence went to similarities in a particular design flaw, not the vehicles as a whole.

■ Where a plaintiff intends to adduce evidence of the functioning of related products to prove that the product in question was defective, identical conditions need not be present between the two systems. Substantial similarity is sufficient. (See *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 403–404 [185 Cal.Rptr. 654, 650 P.2d 1171] (*Hasson*), disapproved on other grounds in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 [34 Cal.Rptr.2d 607, 882 P.2d 298].) Thus, in an action against an automobile manufacturer to recover for damages arising out of an automobile accident caused by brake failure in a 1966 model vehicle, the California Supreme Court held that the trial court had reasonable basis for admitting evidence of numerous failures occurring in 1965 models for the purpose of showing that 1966 models were similarly defective even if plaintiffs did not prove that the 1965 system was exactly the same as the 1966 system. (*Hasson, supra,* 32 Cal.3d at pp. 403–404.)

Ford argues that the Explorer's and Bronco II's stability characteristics were not sufficiently similar to allow the evidence concerning the Bronco II. The trial judge in the first instance must determine if the design characteristics are sufficiently similar. (*Hasson, supra,* 32 Cal.3d at p. 404.) As

discussed, *ante*, the court found that the Bronco II's and Explorer's relevant design characteristics were substantially similar, and we must give substantial deference to that finding. (See *Bado-Santana v. Ford Motor Co.* (D.P.R. 2005) 364 F.Supp.2d 79, 92–94 [in rollover case involving Ford Explorer, court denied Ford's motion in limine to exclude evidence of design and development history of Bronco II as too dissimilar to Explorer, finding such evidence relevant to Ford's knowledge of and failure to correct stability design flaws].)

Moreover, "[w]hen evidence is offered to show only that defendant had notice of a dangerous condition, the requirement of similarity of circumstances is relaxed: ' "[A]ll that is required . . . is that the previous injury should be such as to attract the defendant's attention to the dangerous situation." ' " (*Hasson, supra,* 32 Cal.3d at p. 404.)

Here, the evidence was relevant to prove that Ford knew it was designing and manufacturing a vehicle with the same stability design defects as the Bronco II. It was also evidence that could establish malice, fraud and oppression necessary for punitive damages. Ford knew that to increase a vehicle's stability, it needed to widen the vehicle's track width and lower the center of gravity. The Wilsons presented evidence that Ford engineers requested such changes in the Explorer's design, but those were rejected. The Explorer's center of gravity, track width and SI were substantially similar to the Bronco II's.

The court did not abuse its discretion in admitting evidence concerning the Bronco II's stability problems, as the Explorer's stability characteristics were substantially similar. The evidence was relevant both to prove the cause of the Explorer's stability defect and to show notice on Ford's part at the time it was designing the Explorer.

### B. *Exclusion of Ford's Comparative Rollover Statistics*

Ford asserts that the court erred by excluding Ford's "real-world safety record and comparative data" relating to Explorer rollover rates. We reject this contention.

#### 1. *Background*

Ford cites several evidentiary rulings regarding the Explorer's comparative rollover rates that it asserts were erroneous. First, the court ordered stricken from the trial court record testimony offered by Ford that the Explorer "had one of the best rollover rates compared to other SUV's in its class." The court also refused to allow Ford's automotive engineering expert Don Tandy to testify as to whether the Explorer had a higher rollover rate than other SUV's

(sport utility vehicles). Ford asserts that the court erred in refusing to allow its statistical expert, William Wecker, Ph.D., to testify that the Explorer had a rollover rate comparable to other SUV's. The court also refused to allow Ford's stability expert Lee Carr to testify concerning accident statistics and rollover rates of other vehicles.

Ford also contends that the court "compounded its errors" by allowing several of the Wilsons' witnesses to testify concerning their involvement in other Explorer rollover cases.

### 2. *Waiver*

The Wilsons assert that Ford waived the right to assert error regarding the testimony of its expert Dr. Wecker concerning the Explorer's rollover rate compared to other vehicles. The Wilsons point out that they brought a motion in limine to exclude his opinion, but the court reserved ruling on his testimony pending a foundational showing by Ford, and thereafter Ford did not attempt to lay a foundation for his testimony.

Ford responds that the court ruled Dr. Wecker's testimony inadmissible in an unreported sidebar conference and that counsel for the Wilsons acknowledged this ruling on the record when it argued against admission of other similar evidence that Ford could not "get in from the Wecker types." Ford also asserts that it objected on several occasions more generally that it should have been allowed to present evidence of the Explorer's safety record as compared to other vehicles.

We conclude that there was no waiver. First, a review of the trial transcript indicates that counsel for the Wilsons did acknowledge on the record that Dr. Wecker's testimony was previously excluded by the court. Moreover, " '[w]here an entire class of evidence has been declared inadmissible or the trial court has clearly intimated it will receive no evidence of a particular class or upon a particular issue, an offer of proof is not a prerequisite to raising the question on appeal . . . .' [Citation.]" (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2005) ¶ 8:275.6, p. 8-154.)

### 3. *Analysis*

Ford asserts that expert testimony concerning the Explorer's comparative rollover rate was admissible to demonstrate that the Explorer "is a reasonably safe vehicle that is not unusually prone to roll over in comparison to other vehicles." However, such evidence was irrelevant and inadmissible.

■ A manufacturer cannot defend a product liability action with evidence it met its industry's customs or standards on safety. (*Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 803 [174 Cal.Rptr. 348] (*Grimshaw*); *Foglio v. Western Auto Supply* (1976) 56 Cal.App.3d 470, 477 [128 Cal.Rptr. 545].) In fact, admission of such evidence is reversible error. (*Heap v. General Motors Corp.* (1977) 66 Cal.App.3d 824, 831 [136 Cal.Rptr. 304].) This is because in strict liability actions, "the issue is not whether defendant exercised reasonable care." (*Foglio, supra,* 56 Cal.App.3d at p. 477.) Rather, the issue is whether the product fails to perform as the ordinary consumer would expect. (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 435 [143 Cal.Rptr. 225, 573 P.2d 443] (*Barker*).)

In *Grimshaw, supra,* 119 Cal.App.3d 757, the defect at issue was the Ford Pinto's gas tank. Ford requested that the court instruct the jury that, in considering whether the gas tank was defective, it was to consider " 'the extent to which its (Pinto's) design and manufacture matched the average quality of other automobiles and the extent to which its design and manufacture deviated from the norm for automobiles designed and manufactured at the same point in time.' " (*Id.* at p. 803.) The Court of Appeal held that the trial court properly refused the instruction as improper evidence of industry custom or practice. (*Ibid.*)

Thus, the court properly excluded evidence whereby Ford sought to prove that the Explorer's rollover rate was comparable to other vehicles on the road. That was evidence that improperly sought to show that it met industry standards or custom for rollovers.

Ford asserts that the comparative rollover rate was relevant to the "risk/benefit" analysis that must be considered in determining if a product is defective, citing *Barker, supra,* 20 Cal.3d 413. However, as explained in *Grimshaw*, the *Barker* risk/benefit analysis does not allow admission of such evidence: "The *Barker* court's enumeration of factors which may be considered under the risk-benefit test not only fails to mention custom or usage in the industry, the court otherwise makes clear by implication that they are inappropriate considerations." (*Grimshaw, supra,* 119 Cal.App.3d at p. 803.)

■ Ford also contends that the comparative rollover evidence was relevant to prove it did not act with oppression, fraud or malice and therefore was admissible to rebut the Wilsons' claim for punitive damages. However, as will be discussed in more detail, *post,* the Court of Appeal in *Grimshaw, supra,* 119 Cal.App.3d 757, held that compliance with industry standards or custom was irrelevant not only to the issue of defect, but also to punitive damages. (*Id.* at pp. 792, 803, 807–822.) Indeed, counsel for Ford acknowledged at trial that the Wilsons' punitive damages allegations did not change *Grimshaw*'s prohibition on industry custom and practice evidence.

Even if the comparative rollover data were not inadmissible as a matter of law as improper industry and custom evidence, it would still be inadmissible as unreliable and misleading. Ford's statistics from which the comparable rollover rate testimony would flow were drawn from two databases, FARS (Fatality Analysis Reporting System), and a state database tracking state accident information. FARS only included fatal rollover accidents and did not compare the relative stability of vehicles; included all vehicle types, not just SUV's; and did not track the cause of rollovers or the resulting injuries. The state database encompassed accidents from only 10 states, did not include the two most populous states, California and Texas, and did not detail causes of the rollovers.

In Ford's offer of proof for its expert Carr, it admitted his testimony was going to compare the Explorer's rollover performance to a variety of dissimilar vehicles, including Greyhound buses and passenger cars. The court excluded only that portion of his testimony. Carr opined that the Explorer's design did not contribute to the rollover. Rather, according to Carr, the Explorer rolled because Mrs. Wilson steered it onto the dirt shoulder, which, because of the loose soil and uneven terrain, would make any vehicle, not just the Explorer, susceptible to rolling over. Carr also testified that the Explorer complied with stability guidelines related to steering. Over the Wilsons' objection, Carr was allowed to show a video of the rollover response of a 1992 Chevrolet van to challenge the testing methodology used by the Wilsons' expert Dr. Renfroe. Over the Wilsons' objection he was also allowed to testify concerning the number of rollovers of various vehicles around the country. According to Carr, the vast majority of rollovers for all types of vehicles happened off the paved surface of the road.

Further, while the court excluded evidence of the Explorer's comparative safety, accident or injury rates, it did not exclude the Explorer's own "real world safety record." Indeed, Ford never proffered such evidence at trial.

The court did not abuse its discretion by excluding Ford's proffered evidence on comparative rollover rates.

The court also did not "compound its errors" by allowing several of the Wilsons' witnesses to testify as to their involvement in other Explorer rollover cases. Ford did not object to this testimony as improper. The only objection to this testimony overruled by the court was "asked and answered."

## II. NONECONOMIC DAMAGES

Ford asserts that the noneconomic damages award, as remitted by the court, of approximately $65 million to Mrs. Wilson, and the $5 million award to Mr. Wilson, as remitted by the court, are excessive as a matter of law, are the result of passion and prejudice, are extreme when viewed against awards

that have been upheld in comparable cases, and violate its due process rights. Amicus curiae AAM also asserts that the award violates due process principles. We conclude that the noneconomic damage award to Mrs. Wilson is excessive, the result of passion or prejudice, and that the substantial evidence in this case supports an award of $18 million. We also conclude, however, that Mrs. Wilson's award did not violate due process principles. We conclude that the award to Mr. Wilson of $5 million in damages for loss of consortium is reasonable and we affirm that award.

### A. Size of the Award

#### 1. Standard of review

"The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently, as in this case, see the injury and the impairment that has resulted therefrom. . . . The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506–507 [15 Cal.Rptr. 161, 364 P.2d 337] (*Seffert*).)

"The reviewing court does not act de novo, however. As we have observed, the trial court's determination of whether damages were excessive 'is entitled to great weight' because it is bound by the 'more demanding test of weighing conflicting evidence than our standard of review under the substantial evidence rule . . . .' [Citation.] All presumptions favor the trial court's determination [citation], and we review the record in the light most favorable to the judgment [citation]." (*Fortman v. Hemco, Inc.* (1989) 211 Cal.App.3d 241, 259 [259 Cal.Rptr. 311].)

Further, " 'where the trial court has required a remission as a condition to denying a new trial "a verdict is reviewed on appeal as if it had been returned in the first instance by the jury in the reduced amount." [Citations.]' [Citation.]" (*West v. Johnson & Johnson Products, Inc.* (1985) 174 Cal.App.3d 831, 877 [220 Cal.Rptr. 437] (*West*).)

#### 2. Analysis

In reviewing a noneconomic damage award "[t]here are no fixed or absolute standards by which an appellate court can measure in monetary terms the extent of the damages suffered by a plaintiff as a result of the wrongful act of the defendant. The duty of an appellate court is to uphold the jury and trial judge whenever possible. [Citation.] The amount to be awarded

is 'a matter on which there legitimately may be a wide difference of opinion'[citation]. In considering the contention that the damages are excessive the appellate court must determine every conflict in the evidence in respondent's favor, and must give him the benefit of every inference reasonably to be drawn from the record [citation]. [¶] While the appellate court should consider the amounts awarded in prior cases for similar injuries, obviously, each case must be decided on its own facts and circumstances. Such examination demonstrates that such awards vary greatly. [Citations.] Injuries are seldom identical and the amount of pain and suffering involved in similar physical injuries varies widely. These factors must be considered." (*Seffert, supra,* 56 Cal.2d at p. 508.)

Further, "[t]he fact that an award may set a precedent by its size does not in and of itself render it suspect. The determination of the jury can only be assessed by examination of the particular circumstances involved." (*Rodriguez v. McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 654–655 [151 Cal.Rptr. 399].)

■ "An appellate court should not assume to substitute its appraisal, for that of a jury, of the amount of damages for physical pain and mental suffering sustained by a party in a case where trial by jury was had as a matter of right [citation], but in a case where it appears that a verdict is so grossly disproportionate to any reasonable limit of compensation warranted by the facts as to shock the sense of justice and raise at once a strong presumption that it is based on prejudice or passion rather than sober judgment [citations] the appellate court may reverse the judgment and remand the case for a new trial either on all the issues or on the issue of damages alone [citations], or it may, in the interests of justice and with the consent of the party against whom the modification is made, modify the judgment as to the amount of damages, and affirm it as modified [citations]." (*Deevy v. Tassi* (1942) 21 Cal.2d 109, 120–121 [130 P.2d 389]; see also *Hunton v. California Portland etc. Co.* (1944) 64 Cal.App.2d 876, 882–885 [149 P.2d 471] [trial court, on a motion for new trial, found compensatory damages award excessive and reduced a jury verdict of $40,000 to $18,000; on appeal the appellate court, finding the award still excessive, reduced the damages to $10,000].)

Ford characterizes the jury's award to the Wilsons of $118 million in noneconomic damages ($105 million to Mrs. Wilson + $13 million to Mr. Wilson) and the court-reduced award of approximately $70 million (approximately $65 million to Mrs. Wilson + $5 million to Mr. Wilson) as "irrational, punitive, and the clear product of passion and prejudice" and

asserts that the evidence "does not come close to supporting this unprecedented award."[6] We conclude that although Mrs. Wilson's injuries were catastrophic, analyzing all appropriate factors, reviewing the trial court record, and using our collective experience, we must reduce the noneconomic damage award as excessive and the product of passion and prejudice. We also conclude that the loss of consortium award to Mr. Wilson is reasonable and affirm that award. Because Ford focuses its discussion almost exclusively on the award to Mrs. Wilson, our analysis likewise focuses on whether that award was excessive.[7]

### a. *Nature of Mrs. Wilson's injuries*

A review of the evidence shows the substantial nature of the Wilsons' noneconomic injuries. Mrs. Wilson, a once vibrant and energetic wife and mother is now a paraplegic, who is in constant and debilitating pain, has lost all control over her bladder and bowel movements, and now requires constant care from her husband. She is disfigured and subject to ailments associated with her injuries that could worsen her injuries or shorten her life span. Mr. Wilson has lost his role as a husband and is now reduced to being a constant caregiver.

Noneconomic damages do not consist of only emotional distress and pain and suffering. They also consist of such items as invasion of a person's bodily integrity (i.e., the fact of the injury itself), disfigurement, disability, impaired enjoyment of life, susceptibility to future harm or injury, and a shortened life expectancy. (Judicial Council of Cal. Civ. Jury Instns. (2003–2004), CACI No. 3905A.)

In this case, the noneconomic damages suffered by Mrs. Wilson were substantial, permanent, and support a significant award. However, the reduced award of approximately $65 million is, even given the severity of her injuries, disproportionate to those injuries so as to "raise a strong presumption that it is based on prejudice or passion." (*Saari v. Jongordon Corp.* (1992) 5 Cal.App.4th 797, 807 [7 Cal.Rptr.2d 82].)

---

[6] In making this assertion, Ford neglects to discuss the evidence in support of the Wilsons' damages at all, much less in the light most favorable to the judgment. This failure in itself would allow this court to disregard Ford's arguments concerning damages. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 [19 Cal.Rptr.3d 416].) Nevertheless, we elect to consider Ford's contention on the merits.

[7] We also note, as discussed, *ante*, that we do not review whether the jury's original award of $118 million to the Wilsons "shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Seffert, supra,* 56 Cal.2d at pp. 506–507.) Rather, since the court remitted the award to $70 million as a condition of denying Ford's motion for new trial, we review the noneconomic damage award " ' "as if it had been returned in the first instance by the jury in the reduced amount." [Citations.]' [Citation.]" (*West, supra,* 174 Cal.App.3d at p. 877.)

## b. *Amount of award vs. projected life span*

We also consider the amount of the damage award in connection with Mrs. Wilson's projected life span of 35 years.[8] The damage award, as reduced by the court, still amounts to approximately $1,868,399 per year over her projected life span, an extremely high amount. Ford on the other hand argues an award of $1 million is reasonable, which would work out to $28,571 per year, and only $78 per day. While we believe that the award as reduced by the trial court is still excessive, we also do not believe that Ford's suggested award fairly and justly compensates Mrs. Wilson.

## c. *Comparison with other awards*

In support of its position that the noneconomic damage award is excessive as a matter of law, Ford attempts to compare the award to published California decisions that have upheld damage awards on similar facts. The Wilsons, on the other hand, argue that it is not appropriate to compare the award here to other cases, that we must review it only by looking at the particular facts of this case. We conclude that while it is appropriate to look at awards in similar cases, ultimately we must determine the propriety of the award based upon the facts of this case.

■ In *Seffert, supra,* 56 Cal.2d at page 508, the California Supreme Court stated, "While the appellate court *should consider the amounts awarded in prior cases for similar injuries,* obviously, each case must be decided on its own facts and circumstances. Such examination demonstrates that such awards vary greatly. [Citations.] Injuries are seldom identical and the amount of pain and suffering involved in similar physical injuries varies widely." (Italics added.) More recently, the California Supreme Court made the following statements in a footnote: "Defendants have compiled a lengthy list of judgments awarding damages which have been reversed on appeal as excessive. Those cases do not, *in and of themselves,* mandate a reversal here. The vast variety of and disparity between awards in other cases demonstrate that injuries can seldom be measured on the same scale. The measure of damages suffered is a factual question and as such is a subject particularly within the province of the trier of fact. For a reviewing court to upset a jury's factual determination on the basis of what other juries awarded to other plaintiffs for other injuries in other cases based upon different evidence would constitute a serious invasion into the realm of factfinding. [Citations.] Thus, we adhere to the previously announced and historically honored standard of reversing as excessive only those judgments which the entire record, when

---

[8] Mrs. Wilson's projected life span at the time of trial was 33 years. However, we use 35 years here because the award of noneconomic damages included an award for approximately two years of past general damages.

viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice on the part of the jurors." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 65, fn. 12 [118 Cal.Rptr. 184, 529 P.2d 608] (*Bertero*), italics added.)

The Wilsons assert that *Bertero* stands for the proposition that Courts of Appeal should not compare the damages in other similar cases at all in reviewing a claim that an award is excessive. However, we do not read *Bertero* so broadly. Its criticism of comparing damage awards from other cases was limited to the statement that judgments awarding damages in other cases "do not, *in and of themselves*, mandate a reversal." (*Bertero, supra,* 13 Cal.3d at p. 65, fn. 12, italics added.) In the quoted footnote the *Bertero* court cited the earlier *Seffert* court as support for its conclusion. (*Bertero, supra,* at p. 65, fn. 12.) Therefore, we conclude that a verdict may not be held to be excessive as a matter of law simply because it exceeds the amount awarded in other cases. Courts of Appeal must make their decisions based on the evidence in the case being reviewed. However, evidence of other verdicts is still relevant as a point of reference, to provide context to the award by establishing a range of values for similar injuries.

Ford cites five reported California decisions where noneconomic damages for purportedly similar injuries ranged from $1 million to $8.4 million. (*Mendoza v. Club Car, Inc.* (2000) 81 Cal.App.4th 287 [96 Cal.Rptr.2d 605] [50-year-old plaintiff—award of $1 million]; *Niles v. City of San Rafael* (1974) 42 Cal.App.3d 230 [116 Cal.Rptr. 733] [child suffered paralysis from head trauma—award of $1,604,371]; *Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225 [32 Cal.Rptr.2d 136] [the plaintiff rendered paraplegic from gunshot—award of $2.99 million]; *Fortman v. Hemco, Inc.* (1989) 211 Cal.App.3d 241 [259 Cal.Rptr. 311] [three-year-old girl rendered paraplegic from fall from car—$6 million award]; *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516 [117 Cal.Rptr.2d 220, 41 P.3d 46] [the plaintiff rendered paraplegic after his truck rolled—$8.4 million award].)

However, the cited cases are of only small assistance. Of the five California cases cited by Ford, in only two were the damages claimed to be excessive, and in both cases the damages awards were upheld. (*Niles v. City of San Rafael, supra,* 42 Cal.App.3d at p. 244; *Fortman v. Hemco, Inc., supra,* 211 Cal.App.3d at p. 261.) In the case with the largest noneconomic damage award, the size of the award was not challenged on appeal. (*Hess v. Ford Motor Co., supra,* 27 Cal.4th at p. 520.) Ford cites no published California decisions involving same or similar injuries where a noneconomic damage award was reversed as excessive.

The Wilsons on the other hand cite an unpublished California decision that involved an award of $38 million in combined economic and noneconomic

damages, reduced by 50 percent due to the plaintiff's comparative fault, to a quadriplegic who was 53 years old, and an award to his wife of $13 million for loss of consortium, which the Court of Appeal upheld. The Wilsons also cite a published decision by an appellate court in Indiana that upheld an award of $55 million in combined economic, noneconomic, and loss of consortium damages, already reduced by a finding that the plaintiff was 20 percent at fault, making the total award $66 million. (*Ritter v. Stanton* (Ind.Ct.App. 2001) 745 N.E.2d 828, 833, 857.)

A review of all of these cases shows a range between $1 million and $66 million in compensatory damages awards and substantial differences in the facts of each case. This demonstrates that while a comparison of other cases may give us a point of reference, ultimately our decision must be based upon the evidence in this case.

### d. *Evidence in record that jury acted out of passion or prejudice*

Perhaps the most important factor that we must consider in determining if the award of noneconomic damages is excessive, other than the amount of the award, is whether there is evidence in the record to support defendants' claim that the jury acted out of passion or prejudice. In this case we have substantial evidence in the record that demonstrates the jury's award was the product of such improper emotions and therefore must be reduced.

In discussing economic damages in closing argument, counsel for the Wilsons argued that Mrs. Wilson suffered "an economic loss of $4.6 million dollars . . . , based on the evidence that came before you." The jury awarded Mrs. Wilson what counsel asked for. The reasonableness of this amount for economic damages is not in dispute on appeal.

In discussing noneconomic damages in his closing argument, counsel for the Wilsons described some of the matters that could be included in such an award. This included past and future physical pain, mental suffering, and loss of enjoyment of life. Counsel then suggested a method for calculating these numbers, taking into account the past injury, as well as future injuries over her 33-year life expectancy. Following that discussion, counsel made the following statement: "I respectfully submit that if you look at the catastrophic injury that we have, the numbers there, *they are probably three to four times the specials is what you are going to find.* It's going to be fair, just and reasonable. And this is an awful lot of money. I know it is. It's a lot of

money. But when someone says it's a lot of money, why are we doing this, you tell them it's a lot of pain. It's a loss of a human being's dignity and worth. . . . And I submit to you that there is no higher value than a good woman who is a good wife, a good mother, a good neighbor, that is out there helping others. And I can't put the number on it, but I want you to be reasonable, just and fair, recognizing the humanity of this issue." (Italics added.) Thus, counsel was requesting the jury award noneconomic damages to Mrs. Wilson in an amount three to four times the amount they awarded in economic damages, or $13.8 to $18.4 million.

As to Mr. Wilson's loss of consortium claim, counsel argued that "it's probably going to be equated perhaps reasonably just to what the economic loss is for his noneconomic loss." Counsel was thus requesting that the jury award Mr. Wilson $4.6 million for his loss of consortium claim.

Next, addressing all the compensatory damages, the Wilsons' counsel stated the following: "I invite defense counsel to address my discussion of damages. If he does not discuss damages in his closing, if he does not disagree with me, *you can accept these numbers as reasonable and just and fair.*" (Italics added.)

Defense counsel did not address the issue of damages in closing argument.

When we compare these numbers to the amount the jury awarded, it is apparent that the jury disregarded the Wilsons' counsel's own statements as to what was a reasonable amount to award in this case. On noneconomic damages to Mrs. Wilson, the jury awarded $105 million, or approximately 13 times the amount counsel requested and stated was "fair, just and reasonable." The reduced award of approximately $65 million is still approximately three to five times that amount. This provides compelling evidence that the jury rejected what even the Wilsons' counsel believed was fair and reasonable, and acted out of passion or prejudice.

The jury's award of loss of consortium damages also supports this conclusion. The jury awarded Mr. Wilson $13 million for his loss of consortium claim, or almost three times what the Wilsons' counsel requested.

The jury's complete rejection of the damages suggested by the Wilsons' counsel, a range for noneconomic damages and an amount for loss of consortium that counsel characterized as fair, reasonable and just, is compelling evidence the jury acted out of passion or prejudice. The fact that the jury's award, and the award as remitted by the court, far exceeded, and had no relation to, the amounts requested by counsel suggests that the jury was not acting as a fair and neutral trier of fact.

There was also a question posed by Ford's counsel that, in light of Mrs. Wilson's catastrophic injuries, may well have inflamed the passions of the jury significantly enough to result in the excessive damage award. Ford's trial counsel, in its last question on cross-examination of Mr. Wilson, posited the following:

"[Q.] The silver lining, to the extent that there could be one, it has brought you and [Mrs. Wilson] and the family closer together? [¶] . . .

"[A.] I think where we were together before, we are together after. I don't think it's done more for us. I think it's—I don't think it's a benefit or a plus in any way. I am sorry, I don't think I can see it that way."

This question implied that the family should find a silver lining in what befell Mrs. Wilson. It may very well have been viewed as callous by the jury and might explain, in some manner, the actions of the jury in rendering a verdict so out of line with the amounts requested by the Wilsons' own counsel.

### e. *Our review of the record*

In addition to considering the above factors, we have reviewed the record to determine whether the award, as remitted by the court, is excessive. This includes reviewing the nature and extent of Mrs. Wilson's injuries, the testimony of lay and expert witnesses on damages, and the damage award. Our own review of the record reveals that the noneconomic damage award was excessive and was the product of passion or prejudice.

### f. *Conclusion*

■ Based upon all of the above factors, and utilizing our collective experience, we conclude that the award of noneconomic damages to Mrs. Wilson, even as remitted by the court, was excessive and that the facts of this case instead support an award of $18 million, within the ratio/range requested by the Wilsons' counsel. As we have discussed, *ante,* the award, even as reduced by the trial court, far exceeds the amount suggested as reasonable, fair and just by the Wilsons' attorney to the jury. That is compelling evidence that the jury acted out of "passion and prejudice" in awarding noneconomic damages. Further, although each case must be analyzed on its own facts, the award far exceeds any award we could locate that was upheld by a California appellate court.

However, the reduction to $18 million in noneconomic damages is in the range of one recent unreported decision in California where the award of

such damages was upheld on appeal. Moreover, utilizing our collective experience, we conclude that an award of $18 million in noneconomic damages is proportionate to Mrs. Wilson's substantial injuries, and is proportionate to the economic damages award. Considering the substantial nature of Mrs. Wilson's injuries, we conclude that $18 million is a just and reasonable amount, an amount " 'a reasonable person would estimate as fair compensation' " under the circumstances of this case. (*Duarte v. Zachariah* (1994) 22 Cal.App.4th 1652, 1665 [28 Cal.Rptr.2d 88].)

Ford asserts briefly that the remitted award of $5 million for loss of consortium to Mr. Wilson was also excessive, citing cases with loss of consortium awards of $229,000 to $2.55 million. However, utilizing the same factors we considered above, and noting the devastating impact on Mr. Wilson's life that Ford's conduct has caused, we do not find the remitted award for loss of consortium to be excessive or the product of passion or prejudice. The amount to which the court reduced these damages approximates the amount suggested by the Wilsons' counsel.

Moreover, to avoid further delay and expense to the parties, and because the record in this matter is sufficiently definite to determine the proper amount of noneconomic damages, we will remit the award of noneconomic damages to $18 million for Mrs. Wilson, conditioned on her acceptance of this reduced amount. If Mrs. Wilson does not agree to the reduced amount, the matter will be reversed and remanded for a new trial on the issue of noneconomic damages, as specified in California Rules of Court, rule 24(d).[9]

### B. *Due Process Considerations*

Ford also asserts that the noneconomic damages award is "unconstitutionally excessive as a matter of federal due process." Amicus curiae AAM makes the same argument, asserting that due process considerations applicable to punitive damages awards should also apply to compensatory damages. This contention is unavailing.

 Ford and AAM ignore the fact that while the United States Supreme Court has in several recent decisions held that due process rights limit the amount of punitive damages that may be imposed upon an individual, a basic

---

[9] Ford asserts that if the noneconomic damages award to Mrs. Wilson is determined to be the product of passion or prejudice, we are required, as a matter of law, to grant a new trial on all issues. However, case authority demonstrates it is appropriate to issue a remittitur under such circumstances. (See *Deevy v. Tassi, supra,* 21 Cal.2d at pp. 120–121; *Bellman v. San Francisco High School Dist.* (1938) 11 Cal.2d 576, 586–589 [81 P.2d 894]; *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1255–1256 [1 Cal.Rptr.2d 301]; *Burnett v. National Enquirer, Inc.* (1983) 144 Cal.App.3d 991, 1011–1012 [193 Cal.Rptr. 206].)

underpinning of those decisions was the very distinction between compensatory damages, which are designed to compensate the plaintiff, and punitive damages, which are in the nature of fines or sanctions, designed to punish and deter a defendant. For example, in *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416 [155 L.Ed.2d 585, 123 S.Ct. 1513] (*State Farm*), the majority opinion began its analysis by making just this distinction: "[I]n our judicial system compensatory and punitive damages, although usually awarded at the same time by the same decisionmaker, serve different purposes. [Citation.] Compensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.' [Citations.] By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution." After establishing this important distinction, the high court concluded that the "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary *punishments* on a tortfeasor." (*State Farm, supra,* 538 U.S. at p. 416, italics added.) The court likened punitive damages to criminal penalties, imposed without the protections of a criminal trial: "Although these awards serve the same purposes as criminal penalties, defendants subjected to punitive damages in civil cases have not been accorded the protections applicable in a criminal proceeding." (*Id.* at p. 417.)

Ford and AAM cite no authority that constitutional due process limitations applicable to punitive damages awards, as recently confirmed by the United States Supreme Court (see *State Farm, supra,* 538 U.S. at p. 412), also apply to compensatory damages awards. Nevertheless, AAM asserts that the rule applicable to punitive damages awards should be extended to noneconomic damage awards because (1) defendants need notice of their potential exposure to such liability that is imposed in a vague and standardless manner; and (2) the lack of concrete standards for such awards enables juries to pursue punitive goals in rendering such awards.

However, because noneconomic damages are not a punishment that serves to deter conduct, but rather compensation to make a plaintiff whole as a result of a defendant's conduct, uncertainty in the proof does not preclude their recovery: "[O]nce the cause and existence of damages have been . . . established [with reasonable certainty], recovery will not be denied because the damages are difficult of ascertainment. . . . The law only requires that the best evidence be adduced of which the nature of the case is capable, and the defendant whose wrongful act gave rise to the injury will not be heard to complain that the amount thereof cannot be determined with mathematical precision." (*Dallman Co. v. Southern Heater Co.* (1968) 262 Cal.App.2d 582, 594 [68 Cal.Rptr. 873]; see also *Speegle v. Bd. of Fire Underwriters* (1946) 29 Cal.2d 34, 46 [172 P.2d 867] [" 'The most elementary conceptions of justice

and public policy require that the wrongdoer shall bear the risk of the uncertainty [in fixing the amount of damages] which his wrong has created' "].)

As the United States Supreme Court has noted, " '[T]he common law rule as it existed at the time of the adoption of the Constitution' was that 'in cases where the amount of damages was uncertain[,] their assessment was a matter so peculiarly within the province of the jury that the Court should not alter it.' [Citation.]" (*Feltner v. Columbia Pictures Television, Inc.* (1998) 523 U.S. 340, 353 [140 L.Ed.2d 438, 118 S.Ct. 1279]; see also *Barry v. Edmunds* (1886) 116 U.S. 550, 565 [29 L.Ed. 729, 6 S.Ct. 501] ["nothing is better settled than [the principle] that, in . . . actions for torts where no precise rule of law fixes the recoverable damages, it is the peculiar function of the jury to determine the amount by their verdict"].) Thus, we are loath to usurp this core function of the jury by relying on mathematical formulas to assess the amount of damages that may be awarded, simply because noneconomic damages are not readily quantifiable.

Nor does the imagined danger that vague standards for imposing or reviewing noneconomic damage awards will lead to juries using such awards as punishment as opposed to compensation justify imposing due process limitations on such awards. The jury was instructed that they "must not let bias, sympathy, prejudice, or public opinion influence [their] decision." Although the jury was instructed that as to noneconomic damages "[n]o fixed standard exists for deciding the amount of these damages," they were also instructed that they "must use [their] judgment to decide a reasonable amount based on the evidence and [their] common sense." The jury was instructed that for future economic damages, "[Mrs.] Wilson must prove that she is reasonably certain to suffer that harm." The court, in instructing the jury on noneconomic damages, also delineated the type of harm for which Mrs. Wilson could recover: "Noneconomic damages may consist of the following: [¶] Past and future physical pain, past and future mental suffering, past and future enjoyment of life, past and future disfigurement, past and future physical impairment, past and future inconvenience, past and future grief, past and future anxiety, past and future humiliation, past and future emotional distress."

Thus, under these instructions juries are given guidance as to the proper matters they may consider in making an award of noneconomic damages. These guideposts protect against the purported danger that juries might use such an award to punish a defendant.

Moreover, to the extent that a jury's award of noneconomic damages is challenged as excessive, the judge, sitting as a 13th juror, then will review the evidence to determine if the award should be remitted. The trial judge is not limited to setting aside an excessive damage award where there is

evidence the jury acted out of passion or prejudice. Rather, " 'it is within the sound discretion of the trial court in ruling on a motion for a new trial on the ground of excessive damages, to grant the same when there is a substantial conflict in the evidence regarding the extent of the damage.' " (*Hughes v. Hearst Publications, Inc.* (1947) 79 Cal.App.2d 703, 705 [180 P.2d 419].) This gives the defendants a further check against excessive awards of noneconomic damages.

Finally, the standard under which appellate courts review such awards, that awards will be reversed if they are the product of "passion or prejudice," also serves to protect against such results. It is true that recent cases have stated that awards for emotional distress can in some instances have a punitive element. (*Gober v. Ralphs Grocery Co.* (2006) 137 Cal.App.4th 204, 223 [40 Cal.Rptr.3d 92]; *State Farm, supra,* 538 U.S. at p. 426.) However, by reducing the award to Mrs. Wilson for noneconomic damages to $18 million, an amount proportionate to her injuries and economic loss, we have removed that portion of the award that was the product of "passion or prejudice," and no punitive element remains.

AAM relies heavily upon a law review article for its position that the vague standards for quantifying noneconomic damage awards justifies imposing federal due process constraints on such awards. However, the author of that article concluded that the solution to such unchecked awards is limits or standards imposed by legislatures, not application of due process notions to compensatory awards. (Niemeyer, *Awards for Pain and Suffering: The Irrational Centerpiece of Our Tort System* (2004) 90 Va. L.Rev. 1401, 1414, 1417–1418.)

Ford and AAM cite one out-of-state authority that states in a footnote that "[a] grossly excessive award for pain and suffering may violate the Due Process Clause even if it is not labeled 'punitive.' " (*Gilbert v. DaimlerChrysler Corp.* (2004) 470 Mich. 749 [685 N.W.2d 391, 400, fn. 22].) However, that court expressly declined to address this constitutional issue and therefore it is not authority for the proposition cited. (*Ibid.* ["there is no need to reach this constitutional question"].)

We conclude that it is not necessary to impose federal due process principles to limit noneconomic damage awards because (1) the Supreme Court in *State Farm, supra,* 538 U.S. 408, imposed due process limits on punitive damages awards because they are similar to criminal penalties, without the protections afforded the defendants in criminal proceedings, and noneconomic damages are designed to compensate, not punish, a defendant; (2) the defendants have adequate notice of potential awards; and (3) the review accorded damage awards by trial and appellate courts ensures that there is no punitive element in noneconomic damage awards.

### III. *PUNITIVE DAMAGES*

Ford asserts that the punitive damages award must be reversed because (1) the Wilsons only proved that reasonable people could disagree regarding the design decisions made by Ford; (2) it complied with all applicable governmental standards; (3) it was improper to admit evidence of Ford's overall financial condition; and (4) the award is excessive under federal and California law. Amicus curiae PLAC argues in support of Ford's first contention, and amicus curiae the Chamber argues in support of the second. We conclude that the punitive damages award, as remitted, is excessive and reduce it to $55 million. We reject the remainder of Ford's and amici curiae's contentions.

#### A. *The "Reasonable People Can Disagree" Argument*

##### 1. *Standard of Review*

We review an award of punitive damages to see if there is substantial evidence that supports a finding by clear and convincing evidence that a defendant acted with fraud, malice or oppression. (*Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 606 [92 Cal.Rptr.2d 897].)

##### 2. *Analysis*

In this case the Wilsons presented evidence, which the jury accepted, that Ford knew of dangerous instability defects in the Explorer. Ford's own testing showed that it was unstable and prone to rollover on flat dry pavement at less than highway speeds. Ford knew before the Explorer was released for sale that the same instability characteristics led to serious injuries to Bronco II drivers. The Wilsons presented evidence that Ford knew that the Explorer's roof was weak and that roof crush caused injury during rollover accidents. Ford had the technology to make the Explorer stable and strengthen the roof, but did not use it. The modifications to strengthen the roof would have cost approximately $20 per vehicle. This evidence constitutes substantial evidence to support the jury's decision to award punitive damages.

Ford asserts, however, that because there was a "reasonable disagreement" among experts concerning the propriety of its design decisions it cannot, as a matter of law, be subject to punitive damages. We reject this contention.

The Wilsons presented expert testimony concerning the design and safety issues on the Explorer. Ford presented contrary expert testimony. The jury rejected the testimony of Ford's experts, as it was entitled to do, that its design decisions were proper and reasonable. Ford's assertion that punitive

damages are not allowed unless all experts agree there were improper design decisions is unavailing. If such an assertion were true, punitive damages would never be allowed in cases where the defendant simply had an expert who disagreed with the plaintiff's expert.

Moreover, the California cases cited by Ford to support this contention do not support its position. They were cases where there was simply a failure of proof to support a punitive damages award. (See *Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 996–997 [4 Cal.Rptr.2d 837, 824 P.2d 643]; *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 348 & 350, fn. 10 [108 Cal.Rptr.2d 776]; *Mason v. Mercury Cas. Co.* (1976) 64 Cal.App.3d 471, 474–475 [134 Cal.Rptr. 545]; *Stewart v. Truck Ins. Exchange* (1993) 17 Cal.App.4th 468, 483–484 [21 Cal.Rptr.2d 338]; *Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 184–185 [28 Cal.Rptr.2d 371].)

Ford also asserts that there was no evidence that any of Ford's decision makers believed the Explorer's design presented an unreasonable risk of injury, presenting the jury with only the "bare and illogical 'inference' that unnamed Ford officials 'must have' acted with malice . . . ." However, the Wilsons presented direct and substantial evidence of Ford management's recognition of the safety implications of their design decisions. As discussed in detail in the factual background, *ante*, there is substantial evidence that Ford decision makers knew how to make the Explorer less dangerous, but chose not to because of financial considerations. Ford's "reasonable people can disagree" argument is unavailing.

PLAC supports Ford's arguments regarding disagreements among experts as a defense to punitive damages, asserting that where there are contemporaneous disagreements among experts regarding design decisions, punitive damages should be barred. However, PLAC cites no California authority for such a proposition. The California case law PLAC cites involves the well-established rule in insurance bad faith cases that an insurer cannot be liable for bad faith if there is an objectively reasonable dispute about coverage. (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co., supra,* 90 Cal.App.4th at pp. 347–348; *Fraley v. Allstate Ins. Co.* (2000) 81 Cal.App.4th 1282, 1293 [97 Cal.Rptr.2d 386].) However, these cases state a substantive standard of liability for insurance claims and do not address when it is proper to impose punitive damages. Notably, PLAC has cited no California product liability case that holds that expert disputes concerning design provide a defense to punitive damage liability or, for that matter, liability in its entirety.

In a footnote, PLAC also cites several out-of-state cases for the proposition that a contemporaneous disagreement among experts bars liability for punitive damages. However, several of the cases cited by PLAC simply do not state such a proposition. Rather, some stand for the proposition that expert disagreement is merely *one factor* that could be considered in assessing the propriety of punitive damages awards. (*Loitz v. Remington Arms Co., Inc.* (1990) 138 Ill.2d 404 [563 N.E.2d 397, 406–407, 150 Ill.Dec. 510]; *Owens-Corning Fiberglas Corp. v. Garrett* (1996) 343 Md. 500 [682 A.2d 1143, 1158–1168]; *Satcher v. Honda Motor Co.* (5th Cir. 1995) 52 F.3d 1311, 1316–1317.)

PLAC does cite two cases from Iowa that held a reasonable disagreement among experts about the adequacy of design was a defense in those cases to punitive damages. (*Mercer v. Pittway Corp.* (Iowa 2000) 616 N.W.2d 602, 618; *Hillrichs v. Avco Corp.* (Iowa 1994) 514 N.W.2d 94, 100.) However, no case from any other state has cited these cases with approval, and we could not locate any other state that follows this "rule." Because these cases apply Iowa law, we are not bound by their holdings and decline to adopt such a rule in California.

PLAC also argues that punitive damages should be barred where there was a contemporaneous expert opinion that a product design that caused a plaintiff injury was necessary to avoid greater injuries of other kinds. This contention is unavailing.

First, this argument by PLAC focuses only on Ford's decisions regarding the Explorer's stability. There is no assertion that Ford allowed the roof defect to exist because changing the design would create a greater risk of other injuries. Because the roof's crashworthiness provided an independent basis for the award of punitive damages, this argument fails.

Further, PLAC cites to no evidence in the record to suggest that any member of Ford rejected changes to the Explorer's stability design because to do so would create a greater risk of injury in another manner. Rather, it only cites to statements made in Ford's brief that imply such a rationale, but Ford's statements are not supported by the cited record.

Ford and PLAC's "reasonable people can disagree" argument is unavailing.

### B. *Compliance with Government Standards*

Ford and amicus curiae the Chamber assert that Ford is not subject to punitive damages as a matter of law because it complied with all applicable governmental regulatory standards. In particular, Ford asserts that it complied

with FMVSS (Federal Motor Vehicle Safety Standard) 216, which sets the standard for how crush resistant an automobile roof must be. Ford also asserts that it complied with a National Highway Traffic Safety Administration (NHTSA) regulation requiring all SUV's to display a warning concerning the risk of rollovers. (See 49 Fed.Reg. 20016 (May 11, 1984).) However, Ford and the Chamber's contentions are unavailing for several reasons.

The law in California is that punitive damages are permitted in product liability actions precisely because "[g]overnmental safety standards and the criminal law have failed to provide adequate consumer protection against the manufacture and distribution of defective products. [Citations.] Punitive damages thus remain as the most effective remedy for consumer protection against defectively designed mass produced articles." (*Grimshaw, supra,* 119 Cal.App.3d at p. 810.) Compliance with a law or safety regulation in itself does not establish that a product is not defective or that a defendant who sells or rents the product for use by the public has exercised due care. (See *Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 126–127 [184 Cal.Rptr. 891, 649 P.2d 224]; *Amos v. Alpha Property Management* (1999) 73 Cal.App.4th 895, 901 [87 Cal.Rptr.2d 34].)

The Chamber asks us to reject the rule stated above in *Grimshaw, supra,* 119 Cal.App.3d 757, that compliance with industry standards does not bar punitive damages, because that decision predates amendments to Civil Code section 3294 that modified the definitions of "oppression, fraud [and] malice" and required proof by clear and convincing evidence. But *Grimshaw* did not base its conclusions on the standard of proof for punitive damages claims or the precise definitions of the terms "oppression, fraud and malice." The Chamber points to nothing in the 1987 amendments, or to any legislative history for those amendments, suggesting the Legislature intended to disapprove *Grimshaw.*

The Chamber relies on the extensive federal regulation of the automobile industry through the NHTSA and the National Traffic and Motor Vehicle Safety Act of 1966 (Safety Act) (49 U.S.C. § 30101 et seq.), which, in conjunction with NHTSA-promulgated standards, has declared the minimum safety standards for automobiles. However, a review of the Safety Act and its legislative history demonstrates that the federal government did not intend to preclude punitive damages where an auto manufacturer has met minimum safety standards.

Title 49 United States Code section 30103(e) (section 30103(e)) of the Safety Act contains a savings clause that provides: "Compliance with a motor vehicle safety standard prescribed under this chapter *does not exempt a person from liability at common law.*" (Italics added.)

Thus, section 30103(e) expressly provides that compliance with federal safety standards is *not* a defense to state common law products liability. Punitive damages have long been a part of the common law, originating in the 1763 English case *Huckle v. Money* (1763) 95 Eng.Rep. 768, and finding early acceptance in the United States when the United States Supreme Court upheld their constitutionality in *Day v. Woodworth* (1851) 54 U.S. 363, 370 [14 L.Ed. 181]. Thus, in enacting this savings clause, Congress was aware that part of the common law to which it referred in section 30103(e) included liability for punitive damages and could have excluded such damages from its terms.

The Chamber asserts that Congress, in enacting the savings clause in section 30103(e), only sought to preserve common law liability in general and did not intend to address punitive damages. However, a review of the legislative history of the Safety Act further demonstrates that Congress intended through the savings clause to leave untouched *all* aspects of common law products liability actions, including awards of punitive damages.

The House Report for the Safety Act states that section 30103(e) "is intended, and this subsection specifically establishes, that compliance with safety standards is not to be a defense *or otherwise to affect the rights of parties under common law particularly those related to warranty, contract, and tort liability.*" (H.R.Rep. No. 1776-89, 2d Sess., p. 24 (1966), italics added.) The Safety Act's Senate sponsor stated on the Senate floor that "[c]ompliance with Federal standards would not necessarily shield any person from broad liability at the common law. *The common law on product liability still remains as it was.*" (Remarks of Sen. Magnuson, 89 Cong. Rec. 14230 (daily ed. June 24, 1966), italics added.) Its House sponsor, while arguing in floor debate against the need for criminal penalties in the Safety Act stated, "[W]e have preserved *every single common law remedy that exists against a manufacturer* for the benefit of a motor vehicle purchaser. This means that all of the warranties and all of the other devices of common law which are afforded to the purchaser, remain in the buyer and they can be exercised against the manufacturer." (Remarks of Rep. Staggers, 89 Cong. Rec. 19663 (daily ed. Aug. 17, 1966), italics added.)

The fact that California does not follow this proposed rule that compliance with federal minimum safety standards bars claims for punitive damages is also demonstrated by the fact that such a rule has been proposed through legislation in California on several occasions but has not been enacted. In 2000 the Legislature considered a bill that would have enacted the rule that Ford proposes. (Assem. Bill No. 2582 (1999–2000 Reg. Sess.) § 1.) However, the bill never made it out of committee. (Assem. Bill No. 2582, from committee without further action, 2 Assem. Final Hist. (1999–2000 Reg.

Sess.) p. 1865.) A similar bill did not secure passage in 1996. (Assem. Bill No. 2880, from committee without further action, 2 Assem. Final Hist. (1995–1996 Reg. Sess.) p. 1711.) Another such bill was introduced in February 2006 in the Senate. (Sen. Bill No. 1429 (2005–2006 Reg. Sess.) § 2.) There would be no need for such legislation if compliance with government standards already provided a defense to punitive damages claims.

Ford and the Chamber's argument is also unavailing because there are no federal standards for stability of vehicles, one ground upon which Ford's liability for punitive damages is based. Ford points to an NHTSA regulation requiring all SUV's to display a warning concerning the risk of rollovers. (See 49 Fed.Reg. 20016 (May 11, 1984).) However, having a warning sticker is not the same as meeting a safety standard, and, in any event, it would not bar a state law claim alleging stability defects.

The Chamber asserts that NHTSA's failure to promulgate stability standards and to require only a warning sticker represents a "policy choice" based upon difficulties in predicting rollover risk and that compliance with the warning requirement alone should bar punitive damages. However, this exact argument was rejected by the Eleventh Circuit in *Watkins v. Ford Motor Co.* (11th Cir. 1999) 190 F.3d 1213, 1216–1218, a Bronco II rollover case. (See also *Ford Motor Co. v. Ammerman* (Ind.Ct.App. 1999) 705 N.E.2d 539, 555–556.)

Ford's asserted compliance with federal safety regulations did not bar the punitive damages award.

### C. *Fair Notice of Exposure to Punitive Damages*

Ford contends that if punitive damages can be awarded on this record, Civil Code section 3294 is unconstitutionally vague because it failed to give Ford fair notice that its conduct could subject it to punitive damages. This contention is unavailing.

Ford made just this argument 25 years ago in *Grimshaw, supra,* 119 Cal.App.3d 757. The Court of Appeal rejected it, concluding that "punitive damages are recoverable in a nondeliberate or unintentional tort where the defendant's conduct constitutes a conscious disregard of the probability of injury to others." (*Id.* at p. 811.)

Additionally, Ford bases this contention on the fact that at most, reasonable people could disagree with the decisions it made. However, we have already discussed and rejected this argument, *ante.*

## D. *Consideration of Ford's Overall Financial Condition*

Ford asserts that the punitive damages award must be reversed because the jury was allowed to consider its overall financial worth (almost $13 billion) as opposed to its worth tied to sales of products in California. We reject this contention.

Where the defendant's oppression, fraud or malice has been proven by clear and convincing evidence, California law permits the recovery of punitive damages "for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294, subd. (a).) As our Supreme Court recently held, in *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1185 [29 Cal.Rptr.3d 379, 113 P.3d 63] (*Simon*): "[T]he defendant's financial condition is an essential factor in fixing an amount that is sufficient to serve these goals without exceeding the necessary level of punishment. '[O]bviously, the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort.' [Citation.] '[P]unitive damage awards should not be a routine cost of doing business that an industry can simply pass on to its customers through price increases, while continuing the conduct the law proscribes.' [Citation.]" (See also *State Farm, supra,* 538 U.S. at p. 428 [use of wealth as a factor not " 'unlawful or inappropriate' "].)

Despite this authority, however, Ford cites *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2004) 116 Cal.App.4th 1253 [11 Cal.Rptr.3d 317] (*R.J. Reynolds*) for the proposition that in assessing punitive damages courts may only take into consideration the defendant's financial figures in the state where the wrong occurred.

In *R.J. Reynolds*, the State of California filed a complaint against the defendant tobacco company for an enforcement order of a consent decree entered into as part of a settlement agreement that prohibited targeting youth in advertising of tobacco products. The superior court found the defendant in violation of that agreement and entered summary judgment, permanently enjoining the company from continuing to violate the settlement. The court also awarded the state sanctions in the amount of $20 million. The defendant appealed, and this court reversed the award of sanctions, finding them to be excessive. Relying on recent United States Supreme Court precedent holding that it was improper to impose punitive damages against a defendant for conduct in one state based upon the defendant's out-of-state conduct, we held that the superior court in *R.J. Reynolds* erred when it based its sanctions award on the defendant's nationwide spending on advertising, as opposed to its advertising activities in California. (*R.J. Reynolds, supra,* 116 Cal.App.4th at pp. 1289–1290.) This court found the sanctions award to be error because

"the People's request for $20 million in sanctions was based on Reynolds's nationwide spending on print advertising and profitability without evidence of its advertising spending or profitability in California." (*Id.* at p. 1290.) As the court stated in *R.J. Reynolds*, "the award of sanctions for Reynolds's conduct in California could not properly be based on Reynolds's nationwide financial figures without violating Reynolds's due process rights." (*Id.* at p. 1289.)

Based upon the above quoted language, Ford asserts that it was error to allow evidence of its overall financial condition, as opposed to its financial worth in California. This contention is unavailing.

Here, the trial court properly instructed the jury, at Ford's request, that it could not consider Ford's out-of-state *conduct* in imposing punitive damages: "In determining the amount of punitive damages, if any, that is necessary to achieve the proper level of punishment and deterrence, you may consider only Ford's wrongful conduct, if any, that has had an adverse impact on the citizens of California. Accordingly, you may not award any punitive damages for the purpose of punishing Ford for the sale of vehicles in other states for any injuries that may have occurred in other states, or for the purpose of changing Ford's conduct in other states."

Consideration of Ford's overall financial condition was not allowed to punish it for out-of-state *conduct* as in *R.J. Reynolds*, but for the broader concept of ensuring that the amount of punitive damages was sufficient to act as a deterrent. Use of a defendant's financial condition in such a manner is proper because " 'the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort.' " (*Simon, supra,* 35 Cal.4th at p. 1185.) Consideration of only a defendant's finances as they relate to the state in which they are sued would allow it to make them " 'a routine cost of doing business that an industry can simply pass on to its customers through price increases, while continuing the conduct the law proscribes.' [Citation.]" (*Ibid.*)

E. *Amount of Award*

Last, Ford argues that the amount of the punitive damages awarded to the Wilsons is excessive under the federal due process clause of the 14th Amendment to the United States Constitution. We conclude that, after reducing the noneconomic damages award to Mrs. Wilson to $18 million, the award of punitive damages is excessive and will be reduced to $55 million, an approximate two-to-one ratio to the total compensatory damages award ($4.6 million in economic damages + $18 million in noneconomic damages + $5 million in loss of consortium damages = $27.6 million x 2 = $55.2 million).

### 1. *Standard of review*

"In deciding whether an award of punitive damages is constitutionally excessive . . . we are to review the award de novo, making an independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct. [Citations.] This '[e]xacting appellate review' is intended to ensure punitive damages are the product of the ' " 'application of law, rather than a decision-maker's caprice.' " ' [Citation.] [¶] On the other hand, findings of historical fact made in the trial court are still entitled to the ordinary measure of appellate deference." (*Simon, supra,* 35 Cal.4th at p. 1172, fn. omitted.)

"To state a particular level beyond which punitive damages in a given case would be grossly excessive, and hence unconstitutionally arbitrary, ' "is not an enviable task. . . . In the last analysis, an appellate panel, convinced it must reduce an award of punitive damages, must rely on its combined experience and judgment." ' [Citation.]" (*Simon, supra,* 35 Cal.4th at p. 1188.) Moreover, our "constitutional mission is only to find a level higher than which an award *may not* go; it is not to find the 'right' level in the court's own view." (*Ibid.*)

### 2. *Analysis*

The United States Supreme Court has determined that the federal due process clause places limits on state courts' awards of punitive damages, limits appellate courts are required to enforce in their review of jury awards. (*State Farm, supra,* 538 U.S. at pp. 416–418.) The imposition of "grossly excessive or arbitrary" (*id.* at p. 416) awards is constitutionally prohibited, for due process entitles a tortfeasor to " 'fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.' " (*Id.* at p. 417.)

 The United States Supreme Court and the California Supreme Court have stated that there are three factors to consider in determining whether the amount of a punitive damages award comports with the federal due process clause: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the . . . harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages [and comparable civil penalties where available]." (*State Farm, supra,* 538 U.S. at p. 418; see *Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191 [29 Cal.Rptr.3d 401, 113 P.3d 82].) We discuss these factors in order.

*Reprehensibility of conduct*

█ Courts utilize five factors to help determine the degree of reprehensibility of a defendant's conduct: (1) whether the harm was physical and not merely economic; (2) whether the conduct demonstrated an indifference or reckless disregard for the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct was repeated or an isolated incident; and (5) whether the conduct was the result of intentional acts or mere accident. (*State Farm, supra,* 538 U.S. at p. 419; *Simon, supra,* 35 Cal.4th at p. 1180.) Further, the reprehensibility of a defendant's conduct is the most important indicator of the reasonableness of a punitive damages award. (*State Farm, supra,* 538 U.S. at p. 419; *Simon, supra,* 35 Cal.4th at p. 1180.)

Based upon our de novo review of the record, we conclude that the reprehensibility of Ford's conduct was high, given the catastrophic nature of Mrs. Wilson's injuries, Ford's reckless disregard for the safety of others, the repeated nature of Ford's conduct, and the fact that Ford's acts were intentional.

Focusing on the first factor, Ford's decision to release the defective Explorer resulted in catastrophic and permanent physical injuries to Mrs. Wilson, not merely economic loss. She is permanently paralyzed and in constant, debilitating, pain. She is confined to a wheelchair, without sensation or muscular control of her lower body. She must rely on others to care for her. As Mrs. Wilson explained it: "Me being dependent on other people . . . for me that is very difficult because I have always been an independent sort of person. . . . I have always been the one that has done things for other people. For me that is very hard to . . . have to be in that kind of position. . . . I am in a wheelchair, I am not going to ever be out of a wheelchair, that whole concept is very . . . difficult to . . . accept. . . . The things that I really love to do I can't do anymore. The list is just—goes on and on."

As discussed *ante,* and as found by the jury, Ford's decision to release the defective Explorer without warning consumers of the risk of injury it posed evinced a reckless disregard for the safety of its customers. As the trial court noted in ruling on Ford's motion for new trial on the ground the punitive damage award was excessive, "the evidence showed Ford had a pattern of deficient design regarding safety in favor of increased financial returns and was the result of the conscious disregard of Ford executives." Our own independent review of the record compels the same conclusion. Thus, the second factor also supports a significant punitive damages award.

The target of the conduct in this case was consumers, individuals who were vulnerable as they would not understand vehicle design, development and manufacture, and would rely on Ford to inform them of risks as they made purchasing decisions.

Conduct is more reprehensible where, as here, it is part of repeated corporate policy or practice rather than an isolated incident. (*Johnson v. Ford Motor Co., supra,* 35 Cal.4th at p. 1196.) In this case the conduct was repeated and not an isolated incident. Ford had a pattern of deficient safety design that was ignored in favor of increased financial returns. As discussed in more detail, *ante*, that corporate policy or practice was evidenced by Ford's refusal to follow its engineers' recommendations to improve the stability of the Explorer. As the trial court noted, "[T]hat evidence was primarily adduced through Ford's own internal memoranda and correspondence."

The evidence presented by the Wilsons in this case supports a finding that Ford's actions were the result of intentional conduct and deliberate decisions by Ford's management, knowing the unreasonable risk of harm posed to consumers, as opposed to a mere accident.

Moreover, the fifth factor, whether the conduct was the result of intentional acts or mere accident, "is of little value in assessing a California punitive damages award, as accidentally harmful conduct cannot provide the basis for punitive damages under our law. At a minimum, California law requires conduct done with 'willful and conscious disregard of the rights or safety of others' or despicable conduct done 'in conscious disregard' of a person's rights." (*Simon, supra,* 35 Cal.4th at p. 1181.) The jury's finding that Ford acted with "oppression, fraud or malice" demonstrates Ford's actions were intentional. In sum, the reprehensibility of Ford's conduct supports a significant award of punitive damages.

### 3. *Ratio of punitive to compensatory damages*

In *State Farm*, the United States Supreme Court, while still "declin-[ing] . . . to impose a bright-line ratio which a punitive damages award cannot exceed," held that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." (*State Farm, supra,* 538 U.S. at p. 425.) The high court "also explained that past decisions and statutory penalties approving ratios of three or four to one were 'instructive' as to the due process norm, and that while relatively high ratios could be justified when ' "a particularly egregious act has resulted in only a small amount of economic damages" [citation] . . . [t]he converse is also true . . . . When compensatory damages are substantial, then

a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.' " (*Simon, supra,* 35 Cal.4th at p. 1182.)

Our high court has interpreted this language from *State Farm* to mean that it established a "type of presumption: ratios between the punitive damages award and the plaintiff's actual or potential compensatory damages significantly greater than 9 or 10 to 1 are suspect and, absent special justification (by, for example, extreme reprehensibility or unusually small, hard-to-detect or hard-to-measure compensatory damages), cannot survive appellate scrutiny under the due process clause." (*Simon, supra,* 35 Cal.4th at p. 1182, fn. omitted.)

Here, after our reduction of the noneconomic damages awarded to Mrs. Wilson, the compensatory damages, while substantial, are within a reasonable range for the type of catastrophic, permanent and ongoing injuries suffered by Mrs. Wilson, and the loss of her society, comfort and companionship to Mr. Wilson. Mrs. Wilson's recovery for noneconomic damages is proportionate to the injuries she suffered. Similarly, Mr. Wilson's recovery on his loss of consortium claim is proportionate to his substantial injury. Moreover, as discussed, *ante,* there was a high degree of reprehensibility to Ford's conduct. Because the noneconomic damages award is substantial, a low single digit ratio is appropriate. We are mindful of the Supreme Court's statement in *State Farm, supra,* 538 U.S. at page 425 that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." In this case we conclude that a two-to-one ratio is warranted because the degree of Ford's reprehensibility is also high.

### 4. *Comparable civil penalties*

Ford does not address this factor in its opening brief. However, for the first time in its reply brief Ford asserts that there are comparable civil penalties to compare with the amount of the punitive damages claim. Ford cites title 49 United States Code section 30165(a), which it claims provides penalties for designing and selling defective vehicles, penalties that are $1,000 for each vehicle, up to a maximum of $800,000. Ford asserts that since the punitive damages award "dwarfs" the maximum penalties allowed under that federal statute, the punitive damage award is constitutionally infirm. This contention is unavailing.

First, we do not consider matters raised by appellants for the first time in their reply briefs. Because Ford did not address this factor in its opening brief, thus denying the Wilsons an opportunity to respond, it has waived the

right to assert this issue on appeal. (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761 [27 Cal.Rptr.3d 648, 110 P.3d 903]; *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894, fn. 10 [93 Cal.Rptr.2d 364].)

Additionally, title 49 United States Code section 30165(a) is part of that portion of the Safety Act which provides, as discussed, *ante*, only minimum safety standards. Moreover, as also discussed in detail, *ante*, there is a savings clause that allows common law liability notwithstanding compliance with those standards, putting Ford on notice that it may be subject to private state actions that result in substantially higher damage awards than the civil penalties. The savings clause also evidences congressional intent that the maximum penalty allowed under title 49 United States Code section 30165 is not a sufficient penalty for all such violations because the varying degrees of plaintiffs' injuries and defendants' culpability dictate a greater flexibility in punishment. (See *Ford Motor Co. v. Sperau* (Ala. 1997) 708 So.2d 111, 122.)

Finally, the sanctions amounts in title 49 United States Code section 30165(a) were increased in 2000 to a range of $5,000 to $15 million, indicating Congress's belief that the original amounts were insufficient to deter vehicle manufacturers from placing defective automobiles on the road. The maximum penalty under the 2000 amendments is not "dwarfed" by the punitive damage award, as remitted.

### 5. *Conclusion*

Based upon the foregoing factors, and using our combined experience and judgment, we conclude that a two-to-one ratio of punitive damages to compensatory damages is sufficient to punish Ford and deter it from similar conduct in the future. This ratio is proportionate to the degree of harm suffered and the substantial award of compensatory damages. An award exceeding a two-to-one ratio would exceed the constitutional maximum that could be awarded under the facts of this case. (*Simon, supra,* 35 Cal.4th at p. 1188 [an appellate court's "constitutional mission is only to find a level higher than which an award *may not* go; it is not to find the 'right' level in the court's own view"].) Accordingly, we remit the punitive damage award to $55 million, approximately two times the total compensatory damage award to the Wilsons. If the Wilsons do not agree to the reduced amount, the matter will be reversed and remanded for a new trial on the issue of punitive damages, as specified in California Rules of Court, rule 24(d).

## DISPOSITION

The judgment is affirmed in all respects except as to the award of noneconomic damages to Mrs. Wilson and punitive damages to the Wilsons. The award of noneconomic damages to Mrs. Wilson and punitive damages to the Wilsons is reversed and remanded for retrial on the issue of the amount of noneconomic and punitive damages, unless the Wilsons shall, within 30 days from the date this opinion is filed, file with the clerk of this court and serve upon Ford the Wilsons' written consent to a reduction of Mrs. Wilson's noneconomic damages award to $18 million and the Wilsons' punitive damage award to $55 million, in which event the judgment will be modified to award the Wilsons noneconomic and punitive damages in that amount, and which will result in a total reduced award of $82,606,004 ($4,606,004 in economic damages + $18 million in noneconomic damages + $5 million in loss of consortium + $55 million in punitive damages), and in which event the judgment will be affirmed in its entirety, as modified. (Cal. Rules of Court, rule 24(d).) The parties shall bear their own costs on appeal.

McConnell, P. J., and Irion, J., concurred.

A petition for a rehearing was denied August 17, 2006, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied November 1, 2006, S146150.