Filed 9/10/20

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| KEITH BURCHELL, | |
|     Plaintiff and Respondent, | E071146 |
| v. | (Super.Ct.No. CIVDS1503214) |
| FACULTY PHYSICIANS & SURGEONS OF THE LOMA LINDA UNIVERSITY SCHOOL OF MEDICINE, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Donald R. Alvarez, Judge. Affirmed in part, reversed in part, and remanded with directions.

Horvitz & Levy, S. Thomas Todd, David M. Axelrad, Yen-Shyang Tseng; Winet Patrick Gayer Creighton & Hanes, William J. Rohr, Catherine A. Gayer, and Sarah Y. Sorensen for Defendant and Appellant.

Cole Pedroza, Curtis A. Cole, and Scott M. Klausner for the American Medical Association, California Medical Association, California Dental Association and California Hospital Association as Amici Curiae on behalf of Defendant and Appellant.

David H. Ricks & Associates and David H. Ricks for Plaintiff and Respondent.

In 2014, plaintiff and respondent Keith Burchell underwent what was supposed to be a simple, outpatient procedure to remove a small mass in his scrotum for testing. The surgeon, Dr. Gary Barker, discovered that the mass was more extensive than expected, involving not only the scrotum but also the penis. Barker believed that the mass was malignant. Without consulting either Burchell (who was under anesthesia) or the person Burchell had designated as his medical proxy, Barker removed the mass from both the scrotum and the penis, a different and substantially more invasive procedure than had been contemplated. Burchell suffered serious side effects, some of which are permanent and irreversible. The mass turned out to be benign.

Burchell brought suit, alleging professional negligence and medical battery. A jury returned a verdict for Burchell on both causes of action, awarding him $4 million in past noneconomic damages and $5.25 million in future noneconomic damages. The jury was not asked to consider any economic damages, as the parties stipulated before trial that Burchell's economic damages were $22,346.11. The trial court entered judgment of $9,272,246.11 for Burchell and against defendant and appellant Faculty Physicians & Surgeons of the Loma Linda University School of Medicine (FPS). Pursuant to Code of Civil Procedure section 998 and Civil Code section 3291, Burchell sought an award of costs that included expert witness fees totaling $27,868.42 and prejudgment interest of $1,000,093.92. The trial court denied FPS's motion to tax those costs, as well as its motions for judgment notwithstanding the verdict and for a new trial.

FPS argues here that the award of noneconomic damages should be reduced to the $250,000 limit on such damages in "any action for injury against a health care provider based on professional negligence" provided by Civil Code section 3333.2, subdivision (a), part of the Medical Injury Compensation Reform Act of 1975 (MICRA). In the alternative, FPS argues the award of noneconomic damages was excessive and the product of improper argument by Burchell's counsel, so we should reverse and remand for new trial unless Burchell accepts a reduction of the award to an amount we deem reasonable. Finally, FPS argues that Burchell's offer to compromise pursuant to Code of Civil Procedure section 998 (section 998 offer) was invalid, so the award of expert witness fees and prejudgment interest must be reversed.

We reject FPS's arguments that the award of noneconomic damages should be reduced. The limitation on such damages provided by Civil Code section 3333.2 does not apply to Burchell's medical battery claim, and we do not find the award excessive. We find, however, that Burchell's section 998 offer was invalid, and therefore reverse the award of expert witness fees and prejudgment interest.

## I. BACKGROUND

A. *Facts*

In 2014, Burchell sought medical care after discovering a small lump in his scrotum. At the time, he was 41 years old. He was experiencing some scrotum pain but had no complaints about pain, deformity, or disfunction of his penis, and he reported that he was sexually active.

3

After some initial examinations and tests, Burchell agreed to undergo surgery to remove the mass and send it for testing. The consent forms described the procedure as a "local excision of a scrotal mass," which Burchell was informed was simple, consisting of the surgeon, Barker, making a small incision, removing the mass, and then closing the incision. The common risks and side effects were bleeding, infection, and possible injury to surrounding tissue. The surgery was to be performed under general anesthesia, but as an outpatient; Burchell was expected to go home the same day and be "back on [his] feet" the next day. Burchell designated a proxy, his ex-wife, to make medical decisions on his behalf while he was unable to do so.

During the surgery, which was performed on August 12, 2014, Barker discovered that the mass was larger than expected. Presurgical examinations had detected what Barker believed to be about a one-centimeter mass in the scrotum. In surgery, Barker discovered that the mass was much larger, and it appeared to be vascularized and invading the nerves, blood vessels, and erectile chambers of Burchell's penis. From what he could observe, Barker believed that the mass was malignant, and he understood that even a benign tumor could be harmful.

Barker considered removing only a portion of the mass for biopsy. He decided, however, to instead remove the entire mass, excising tissue not only from Burchell's scrotum but also the penis—a "resection of the proximal corpora." In all, Barker removed a specimen measuring eight by five by two and a half-centimeters. The mass would later be identified as a benign cystic lymphangioma.

4

Barker knew that this more extensive surgery would render Burchell impotent, causing the "immediate loss of the erectile chambers," and damaging the nerves and blood supply to the penis. Barker made the decision to perform this procedure without further consulting either Burchell or his designated proxy, Burchell's ex-wife. Burchell was under general anesthesia, so he could not be consulted without stopping the surgery. Although Burchell's ex-wife was present at the facility during the surgery, Barker did not realize she had been designated to act as Burchell's proxy; he never looked at that portion of the consent form. After the surgery, Burchell could not be sent home as an outpatient, but instead he was hospitalized for several days for "observation and pain control."

Some of the more minor side effects of the surgery resolved in time. A week or two after the surgery, Burchell had to seek emergency treatment for an infection. He had "four huge boils" drained and described his pain as "excruciating," but the infection was ultimately cured. Also, initially, Burchell had pain and numbness in his arms, apparently from not being repositioned during a surgery that took much longer than expected. That issue, however, resolved over time.

Other effects of the surgery have been longer lasting. Since the surgery, Burchell's penis substantially "deviates to the right side," a result of a large section of the right proximal corpora having been removed. He continues to have "spraying of his urinary stream and difficulty voiding in the standing position." He has had constant pain internal to the base of his penis and no feeling at all in his penis. Two reconstructive surgeries, one in 2015 and another in 2016, have reduced his pain somewhat, but not

5

entirely; Burchell testified that he remains "uncomfortable" at best, and when his penis is touched or moved, his pain level "goes up."

After the mass was removed and before reconstructive surgery, Burchell could not get an erection. The two reconstructive surgeries have only partially and unsatisfactorily resolved that issue. The doctor who performed the reconstructive surgeries testified that the "usual landmarks of anatomy and the structure and the surgical planes we usually find" had been "completely obliterated." In the first reconstructive surgery, only a single, short implant, extending about three quarters of the way to the tip of the penis, could be inserted because of extensive scar tissue. This first implant was to act as a tissue expander, making room for a larger, longer implant in a second surgery. The second reconstructive surgery inserted a larger implant, but that implant failed; the muscles that would normally anchor its base had been removed by Barker, and the implant did not remain secure. The implant has slipped backwards, so that when inflated "the end of [the] penis droops over the cylinder." Also, the base of the implant has come loose and pushes back towards Burchell's anus during intercourse, causing pain. Burchell testified that he has achieved orgasm through penetrative sex with the help of the implant, but not often, and generally sex is painful, not pleasurable.

The doctor who performed the reconstructive surgery testified that additional surgery could potentially improve Burchell's condition by creating a better anchor to secure the base of a new implant, and perhaps create a space for a second implant cylinder. Any additional surgery, however, would carry with it substantial risks,

6

including the possibility of an infection that would require complete removal of the implant. Burchell has not, to this point, been willing to accept those risks. He explained: "It's bad enough as it is, but to lose it altogether . . . I would completely lose my manhood." Moreover, no surgery can restore the loss of feeling caused by the severing of nerves.

Burchell presented evidence that, in addition to the physical consequences of the surgery, he has also suffered mentally. He testified that his "world had been turned upside down." He became depressed and withdrawn, not only from his girlfriend but also from his children. Although, at the time of trial, Burchell remained in a relationship with his girlfriend, he testified that their previously "strong bond" had been "destroyed." Both Burchell's ex-wife and his best friend testified that Burchell's mental condition seemed to have improved from his lowest point, but he did not seem entirely recovered.

B. *Procedure*

Burchell initially brought suit against Barker and Loma Linda University Health Care (LLUHC) on March 18, 2015. The complaint asserted causes of action for professional medical negligence and medical battery, alleging that LLUHC was responsible for Barker's actions in its capacity as Barker's employer.

In May 2017, Burchell served Barker and LLUHC with a section 998 offer of $1.5 million. The offer was not accepted, and by statute it was deemed withdrawn 30 days later. (See Code Civ. Proc., § 998, subd. (b)(2).)

7

On April 18, 2018, Burchell submitted a form amendment to the complaint, stating as follows: "Plaintiff(s) having designated a defendant in the complaint by the incorrect name of: Loma Linda University Health Care[,] and having discovered the true name of the said defendant to be Faculty Physicians & Surgeons of the Loma Linda University School of Medicine[,] hereby amends the complaint by inserting such true name in place and stead of such fictitious name wherever it appears in said complaint." It is undisputed that, although Barker was associated with LLUHC, his employer was a different entity, namely, FPS. The trial court signed and filed this amendment on May 1, 2018. On May 2, 2018, the first day of trial, plaintiff's counsel stated on record the following stipulation: "[W]e have a stipulation in place that any verdict that becomes final with respect to Mr. Burchell will be paid by [FPS] and in exchange for that Dr. Barker will be dismissed as a defendant. [. . . .] [T]he jurors will not know any of that information and [Barker] will be tried as if he was remaining as a named party." Barker was dismissed from the lawsuit on May 9, 2018.

In closing argument, Burchell's counsel suggested that the jury should award Burchell past damages of "no less than 4 million dollars," and future damages of "around $365,000 a year," which amounts to $12,775,000, based on a jury instruction with an actuarial estimate that a man of Burchell's age would be expected, on average, to live another 35 years. The jury found in favor of Burchell on both his causes of action and awarded him $4 million in damages for past noneconomic losses, plus $5,250,000 for future noneconomic losses. Pursuant to a stipulation between the parties, an additional

8

$22,346.11, representing economic damages, was added to those sums, and the trial court entered judgment against FPS in the amount of $9,272,346.11.[1]

After trial, Burchell requested costs that included expert witness fees totaling $27,868.42 and prejudgment interest of $1,000,093.92. The trial court denied FPS's motion to tax those costs. The trial court also denied FPS's motions for judgment notwithstanding the verdict and for new trial.

## II. DISCUSSION

A. *MICRA Limit on Noneconomic Damages*

FPS contends that the limit on noneconomic damages set by MICRA applies here, so the jury's award of $9,250,000 in noneconomic damages must be reduced to $250,000. We find that the limitation does not apply.

The relevant portion of MICRA, in Civil Code section 3333.2, provides: "(a) In any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be entitled to recover noneconomic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement and other nonpecuniary damage. [¶] (b) In no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000)."

Although MICRA expressly applies to actions based on professional negligence, our Supreme Court has "not limited application of MICRA provisions to causes of action

---

[1] Even before this surgery, Burchell was unable to work in his profession due to an unrelated medical issue. This circumstance may have some bearing on why his economic damages here were so limited here.

9

that are based solely on a 'negligent act or omission' . . . ." (*Central Pathology Service Medical Clinic, Inc. v. Superior Court* (1992) 3 Cal.4th 181, 192.) "[A]dditional causes of action frequently arise out of the same facts as a medical malpractice cause of action," including battery. (*Smith v. Ben Bennett, Inc.* (2005) 133 Cal.App.4th 1507, 1514.) "Indeed, a plaintiff hoping to evade the restrictions of MICRA may choose to assert *only* seemingly non-MICRA causes of action." (*Ibid.*) When a plaintiff does so, the court must determine whether a cause of action framed as something other than medical malpractice is nevertheless based on a health care provider's professional negligence and therefore subject to MICRA's damages cap; the answer is "sometimes yes and sometimes no." (*Ibid*.) The focus of the court's analysis must be on "the nature or gravamen of the claim, not the label or form of action the plaintiff selects." (*Larson v. UHS of Rancho Springs, Inc.* (2014) 230 Cal.App.4th 336, 347 (*Larson*).)

We exercise independent judgment when required to interpret and apply a statute where the underlying facts are not in dispute. (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912.) To the extent applying the statute required resolution of disputed factual issues, we review those factual findings under the substantial evidence standard. (*Ibid.*)

Our Supreme Court has distinguished between "two qualitatively different types" of medical battery. (*Larson*, *supra*, 230 Cal.App.4th at p. 349 [discussing *Cobbs v. Grant* (1972) 8 Cal.3d 229 (*Cobbs*)].) The first, an intentional tort, "occurs when a physician obtains the patient's consent to perform one type of treatment, but performs a

10

substantially different treatment for which the plaintiff gave no consent."
(*Larson*, at p. 349.) MICRA's limitation on noneconomic damages does not apply to such claims. (E.g., *Perry v. Shaw* (2001) 88 Cal.App.4th 658, 663-664, 668 & fn.4.)

The second type "occurs when a physician performs the treatment for which consent was obtained and an infrequent complication occurs that the physician failed to disclose when obtaining the patient's consent." (*Larson*, *supra*, 230 Cal.App.4th at p. 349.) "In that circumstance, the claim is based on professional negligence, not intentional misconduct, because the physician did not deliberately deviate from the consent, but merely failed to disclose all known potential complications." (*Ibid.*) MICRA's limitation on noneconomic damages applies to this sort of battery, which amounts to a claim that the doctor "failed to meet the applicable standard of care in rendering his services." (*Id.* at p. 352.)

Where a plaintiff brings a hybrid action, proceeding on some theories that would constitute an intentional tort and others that are based on professional negligence, and the plaintiff obtains a recovery that may be based on the "non-MICRA theory," MICRA's limitation on noneconomic damages does not apply. (*Perry v. Shaw*, *supra*, 88 Cal.App.4th at pp. 669-670; see *Waters v. Bourhis* (1985) 40 Cal.3d 424, 437-438 [finding a different MICRA statutory limitation does not apply to "hybrid" action involving both non-MICRA and MICRA causes of action, where the recovery may be based on a non-MICRA theory].)

11

Here, Burchell's medical battery claim falls squarely into the first category of medical battery, not subject to MICRA's limitations on noneconomic damages. Burchell consented to have a small mass removed from his scrotum. He did not consent to Barker performing any surgery involving his penis, nor did his designated proxy consent for him. Although, like a "local excision of a scrotal mass," the surgery Barker performed involved the removal of a concerning bit of tissue, it was nevertheless a substantially different treatment than the one to which Burchell consented. Indeed, we find this case analogous to one that our Supreme Court has cited as a paradigmatic example of a situation "[w]here a doctor obtains consent of the patient to perform one type of treatment and subsequently performs a substantially different treatment for which consent was not obtained." (*Cobbs*, *supra*, 8 Cal.3d at p. 239.) In *Corn v. French* (1955) 71 Nev. 280, the patient had consented to exploratory surgery of her breast to determine whether a lump was cancerous, but the doctor instead performed a mastectomy. (*Id.* at pp. 281, 289 [cited in *Cobbs*, at p. 239].) Here, too, the patient consented only to removal of a small mass for diagnosis, but the surgeon performed a much more extensive resection.

As FPS notes, and as the jury here was instructed, a doctor may act beyond the patient's express authorization in "life- or health-threatening situations." (*Conte v. Girard Orthopaedic Surgeons Medical Group, Inc.* (2003) 107 Cal.App.4th 1260, 1268; see also *Cobbs*, *supra*, 8 Cal.3d 229, 243 ["in an emergency consent is implied"].) Here, however, there was substantial evidence to support a finding that there was no such emergency. Barker testified that his immediate concern, from his observation of the mass

12

during surgery, was that Burchell's urethra would be damaged if the mass was not removed and continued to grow. He also testified, however, that this was a concern over the following "months . . . [¶] or a year or two," and only a "low risk" in the short term. Barker further testified that waiting a week for pathology results ran an increased risk of "invasion from the tumor or scarring in the post-operative period," that might have made it more difficult or impossible to preserve the urethra in a later removal, but he characterized any quantification of that risk as "speculation." Moreover, Barker offered no justification for his failure to consult with Burchell's ex-wife during the surgery other than his admittedly negligent failure to look at the form designating her as medical proxy. Even if a proxy had not been immediately available, it would be a stretch to characterize a "low risk" associated with taking a more conservative approach, or "speculation" about possible risks, as evidence of an emergency, requiring the surgeon to act despite a lack of express consent. On this record, the jury was well within the bounds of reason to conclude (as we may infer it did because it returned a verdict in Burchell's favor on his medical battery claim) that there was no life- or health-threatening situation that justified Barker's decision to perform an operation substantially beyond the scope of Burchell's express consent.

As FPS has emphasized in briefing and at oral argument, there was competing expert testimony regarding whether Barker's performance of the surgery fell below the applicable standard of care. That disputed issue, however, was not an element of Burchell's medical battery claim, but rather his alternative cause of action alleging the

13

surgery was performed negligently. The elements of a medical battery claim do not involve a jury determination as to whether the standard of care was violated. (See *Cobbs*, *supra*, 8 Cal.3d at p. 240 ["[E]xpert opinion as to community standard is not required in a battery count, in which the patient must merely prove failure to give informed consent and a mere touching absent consent"].) As discussed above, this is not a case where the alleged medical battery arose from failure to disclose an infrequent complication of a consented-to procedure, which is the type of battery that the case law has held to be based on professional negligence. (See *Larson*, *supra*, 230 Cal.App.4th at p. 349.) In such a case, the physician does not "deliberately deviate from the consent" (*ibid.*); rather the issues are whether a complication is known, and whether it is sufficiently common and/or serious enough to require a warning. Such issues can be decided only with reference to a community standard of care.

In this case, in contrast, Burchell alleged and proved to the jury's satisfaction that he consented to one treatment, and Barker performed a substantially different treatment for which Burchell gave no consent, in the absence of any emergency that would justify doing so. (See *Larson*, *supra*, 230 Cal.App.4th at p. 349.) This was not a failure to disclose an infrequent complication, but the performance of an unexpected and unconsented-to procedure. We do not view the case law as supporting FPS's contention that, by injecting into the trial the defense that Barker acted out of a view that this was an emergency, FPS somehow transformed the medical battery verdict into one that turned on the standard of care, even though the jury rejected that defense. Rather, as explained in

14

*Cobbs* and *Larson*, on medical battery claims like Burchell's, the jury's determination has nothing to do with a community standard of care.[2]

We conclude that MICRA's limitation on noneconomic damages does not apply here.

B. *Excessive Noneconomic Damages*

FPS argues that the $9.25 million in noneconomic damages awarded by the jury is excessive as a matter of law, and that the judgment should be reversed and the matter remanded for new trial unless Burchell acquiesces to a reduced award. We are not persuaded.

"Noneconomic damages compensate an injured plaintiff for nonpecuniary injuries . . . ." (*Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1332.) Such injuries include pain and suffering, emotional distress, as well as "such items as invasion of a person's bodily integrity (i.e., the fact of the injury itself), disfigurement, disability, impaired enjoyment of life, susceptibility to future harm or injury, and a shortened life expectancy." (*Buell-Wilson v. Ford Motor Co.* (2006) 141 Cal.App.4th 525, 549 (*Buell-*

---

[2] One plaintiff's expert, a medical doctor responding to the question of whether it was within the standard of care to proceed with the more extensive surgery without performing any kind of biopsy first, testified: "I don't think it's within the standard of care to do this very large procedure that removes so many structures in the penis in the surgery center without permission from the patient." This sort of testimony, however, though perhaps confusing because it muddles together issues relating to two separate claims, has no bearing on the elements Burchell was required to prove, and is not a basis to conclude that Burchell's medical battery claim somehow "came down to whether Dr. Barker fell below the standard of care," as FPS would have it.

15

*Wilson*), judg. vacated on other grounds *sub nom. Ford Motor Co. v. Buell-Wilson* (2007) 550 U.S. 931.)

"The amount of [noneconomic] damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial." (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506 (*Seffert*); see also *Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412 [on a motion for new trial the trial court acts as an '"independent trier of fact"'].) Determining the amount of money a plaintiff is to be awarded as compensation for noneconomic injuries is "[o]ne of the most difficult tasks imposed on a factfinder." (*Pearl v. City of Los Angeles* (2019) 36 Cal.App.5th 475, 491.) "The inquiry is inherently subjective and not easily amenable to concrete measurement." (*Ibid.*) Naturally, therefore, the appropriate amount of noneconomic damages is "'a matter on which there legitimately may be a wide difference of opinion.'" (*Seffert*, *supra*, at p. 508.)

Our role is different from that of the jury and the trial court. "The duty of an appellate court is to uphold the jury and trial judge whenever possible." (*Buell-Wilson*, *supra*, 141 Cal.App.4th at p. 547.) "An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Seffert*, *supra*, 56 Cal.2d at p. 507.) Accordingly, "[w]e review the jury's damages award for substantial evidence, giving due deference to the jury's verdict and the trial court's denial of the new trial motion." (*Bigler-Engler v. Breg, Inc.* (2017) 7

16

Cal.App.5th 276, 300 (*Bigler-Engler*).)  We "must determine every conflict in the evidence in respondent's favor, and must give him the benefit of every inference reasonably to be drawn from the record."  (*Ibid.*)  We may consider not only the amount of the award, but also other "'indications in the record that the fact finder was influenced by improper considerations,'" such as "inflammatory evidence, misleading jury instructions, improper argument by counsel, or other misconduct."  (*Id.* at p. 299.)  Additionally, it is appropriate to consider amounts awarded in prior cases, either to compare amounts awarded for similar injuries, or to compare injuries found to justify awards of similar magnitude.  (See *id.* at pp. 303-304.)  Nevertheless, "obviously, each case must be decided on its own facts and circumstances."  (*Seffert*, at p. 508.)

Having reviewed the entire record, and viewing the evidence in the deferential light required, the jury's award of noneconomic losses does not, "at first blush," shock our collective conscience or suggest passion, prejudice or corruption.  (*Seffert*, *supra*, 56 Cal.2d at p. 507.)  It is, no doubt, a sizeable award, but Burchell's injuries were devastating.  Although the lump sum award of future damages is larger than the award of past damages, it represents compensation for injuries for a longer period and thus appropriately reflects that, although Burchell's condition has improved, he will continue to suffer some of the effects of Barker's tortious actions for the remainder of his life.  The amount awarded is also substantially less than the amount suggested by Burchell's counsel during closing argument.  (Cf. *Buell-Wilson*, *supra*, 141 Cal.App.4th at p. 553 [finding award excessive in part because, even after reduction by the trial court, it "far

17

exceeded, and had no relation to," the range suggested by Burchell's counsel].)  It follows that we should uphold the determination of both the jury and the trial court that $9.25 million represents not a windfall, but rather reasonable compensation for Burchell's noneconomic damages.

In support of a contrary conclusion, FPS offers arguments falling into three basic categories: (1) that the award is excessive in comparison to analogous prior cases, either in terms of the type of injuries at issue or the magnitude of the award; (2) that there is no "reasonable relationship" between the amount of economic and noneconomic damages; and (3) that misconduct by Burchell's counsel during closing argument shows that the jury relied on improper considerations.  We reject each of these arguments.

First, while it is appropriate to look at awards in similar cases, or to contrast this case on its facts with cases involving awards of a similar magnitude, "ultimately we must determine the propriety of the award based upon the facts of this case." (*Buell-Wilson*, *supra*, 141 Cal.App.4th at p. 550.)  Evidence of other verdicts is "relevant as a point of reference," but "a verdict may not be held to be excessive as a matter of law simply because it exceeds the amount awarded in other cases." (*Id.* at p. 551.)

Moreover, that point of reference may, as here, have only limited persuasive value depending on the quality of the comparison.  Here, for example, FPS cites to statistics for average awards nationwide in cases "involving loss of male genitalia."  The cited statistics, however, describe verdicts in "cases involving severe injury to the male sex organs resulting in impotence or any type of temporary or permanent sexual impairment,"

18

including "cases involving the removal or loss of a testicle(s)." (Personal Injury Valuation Handbook (Thomson Reuters 2020), 2011 WL 5528540.) This description covers a vast range of injuries, and it seems plausible that this case would be most similar to those at the more serious end of the spectrum, the 6 percent of cases that involve awards of $5 million or greater. (*Ibid.*) Similarly, it may be that the award of noneconomic damages here "rivals and often greatly exceeds many of the [noneconomic damages awards] recovered by male paraplegic plaintiffs," as FPS argues. This is hardly surprising, however, given the wide range within which reasonable people may differ regarding an appropriate monetary measure of compensation for physical injuries. (*Seffert*, *supra*, 56 Cal.2d at p. 508.)

For present purposes, we need not discuss each of FPS's arguments comparing this case to verdicts in other cases, either through use of statistics or anecdotal comparison, in any further detail. It is enough to note that we would not find them persuasive, without more, even if we were to accept FPS's assertion that the award here is a statistical outlier. (See *Rodriguez v. McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 654-655, overruled on other grounds in *Coito v. Superior Court* (2012) 54 Cal.4th 480 ["[t]he fact that an award may set a precedent by its size does not in and of itself render it suspect"].) Given the differences in factual circumstances, and the substantial discretion afforded to the jury, statistical comparisons do not provide much of a compass. The focus of our analysis must be on the facts of this case. And here, as noted, the award of noneconomic damages reached by the jury, in which the trial court

19

judge concurred, strikes us as well within the bounds of reason given the evidence presented at trial.

The second of FPS's arguments—that the noneconomic damages award has no "reasonable relationship" to the amount of economic damages—runs contrary to established law. It has long been the rule that "[t]he ratio between special and general damages is not controlling" due to differences in how those types of damages are calculated. (*Wood v. Davenport* (1954) 127 Cal.App.2d 247, 252; accord *Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1078-1079 ["[D]efendant cites to no authority establishing limits upon a general damage award based upon a small amount of special damages. In fact, there is no specific requirement that any special damages be awarded before general damages may be awarded"].)

In support of the notion that there must be some "reasonable relationship" between economic and noneconomic damages, FPS relies primarily on *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1216 (*Major*). The holding of that case, however, is limited to the context of bad faith actions against an insurance company. (*Ibid.* ["[I]*n the insurance bad faith setting*, emotional distress is not recoverable as a separate cause of action, but only as "'an aggravation of the financial damages'"" (italics added)].) Insurance bad faith actions are "brought primarily to recover *economic loss* caused by the tortious interference with a property right, and any damages recovered for actual personal injury, including emotional distress, are incidental to the award of economic damages." (*Gourley v. State Farm Mut. Auto. Ins. Co.*, (1991), 53 Cal.3d 121, 123.) Such reasoning

20

does not apply in the personal injury context, where a plaintiff properly may recover noneconomic damages as simply an "item of damage" flowing directly from the defendant's conduct, and not dependent on or flowing from any economic injuries.  (See *Perry v. Shaw*, *supra*, 88 Cal.App.4th at p. 670.)

Occasionally, even outside the insurance bad faith context, courts have commented on whether an award of noneconomic damages is proportionate to the award of economic damages.  (E.g., *Buell-Wilson*, *supra*, 141 Cal.App.4th at p. 555; *Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 999; see also *Corenbaum v. Lampkin*, *supra*, 215 Cal.App.4th at p. 1333 [noting that "[l]awyers have used the amount of economic damages as a point of reference in their argument to a jury, or in settlement discussions, as a means to help determine the amount of noneconomic damages"].)  We find such reasoning inconsistent with established law.  (*Wood v. Davenport*, *supra*, 127 Cal.App.2d at p. 252; accord *Westphal v. Wal-Mart Stores, Inc.*, *supra*, 68 Cal.App.4th at pp. 1078-1079.)  Of course, in any case where both economic and noneconomic damages are awarded, the ratio between them may be calculated.  The relevant question, however, is not whether the ratio between the award of economic and noneconomic damages is appropriate, but rather whether the amounts selected by the jury for each of the two separate categories of damages are reasonable and supported by substantial evidence.

In short, we disagree that we should consider whether there was a "reasonable relationship" between the award of economic and noneconomic damages here.  Without more, the ratio between economic and noneconomic damages that one could calculate

21

from a judgment does not tend to demonstrate that the award of noneconomic damages was unreasonable. The relevant question is whether the values that make up the ratio are, separately, supported by the evidence. Here, they are.

Finally, we turn to FPS's contention that the award of noneconomic damages was the product of improper argument by Burchell's counsel. More specifically, FPS argues that Burchell's counsel improperly asked the jury to use its verdict not just to reasonably compensate for Burchell's injuries, but also to punish Barker, his employer, and the medical industry, in the hopes of changing their behavior. FPS contends it was also improper for Burchell's counsel to appeal to the jury's self-interest by asking them to use their verdict to protect the community generally and patients like themselves. We find that Burchell's counsel's comments, although improper, do not warrant reversal.

First, we note that FPS forfeited any argument that Burchell's counsel's comments constituted misconduct by failing to object to those comments during trial and either move for a mistrial or seek a curative admonition. (*Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 598 (*Regalado*).) Nevertheless, some courts have considered whether improper attorney argument tended to show that a damages award was the product of passion or prejudice, even where an attorney misconduct claim had not been preserved for appeal. (E.g., *Bigler-Engler*, *supra*, 7 Cal.App.5th at pp. 295-296, 304-305.) We will do the same.

Although FPS failed to raise any objection to Burchell's counsel's comments during trial, it did raise the issue in its motion for a new trial. We review the trial court's

decision to deny that motion deferentially: "[B]ecause of the trial court's unique ability to determine whether a verdict resulted in whole or in part from the alleged misconduct, its decision to deny a motion for new trial should not be disturbed unless plainly wrong." (*Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298, 305 (*Nishihama*).)

We agree with FPS that it was improper for Burchell's counsel to ask the jury to use its verdict to send a "message" to Barker, his employer, and to the medical industry at large, and to invoke famous punitive damages cases in which jury verdicts had "changed the conduct" of the defendant companies. (See *Nishihama*, *supra*, 93 Cal.App.4th at p. 305 ["Any suggestion that the jury should 'send a message' by inflating its award of damages . . . would be improper where, as here, punitive damages may not be awarded"].) It was also improper for Burchell's counsel to ask the jury to cast itself in the role of "protectors of the consumer, the patient, the person on whom a doctor is working" and suggest that the jury use its verdict to "direct the future of care for patients." (See *Regalado*, *supra*, 3 Cal.App.5th at p. 599 [counsel's remarks "telling the jury that its verdict had an impact on the community and that it was acting to keep the community safe were improper"].) Such arguments are inappropriate because they tend to "deflect [jurors] from their task, which was to render a verdict based solely on the evidence admitted at trial." (*Nishihama*, at p. 305.)

Nevertheless, the jury was instructed in no uncertain terms that punitive damages were not to be awarded: "You must not include in your award any damages to punish or make an example of [Barker] and [FPS]. Such damages would be punitive damages, and they cannot be a part of your verdict. You must award only the damages that fairly compensate [Burchell] for his loss." The jury was also instructed to follow the law as given by the court, and that "[i]f the attorneys say anything different about what the law means," they were to follow the court's instructions. "Absent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict reflects the legal limitations those instructions imposed.'" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803-804.) FPS, of course, points to the size of the verdict in Burchell's favor as such a contrary indication. The trial court, however, sitting as an independent trier of fact, found that the jury's award was "more than reasonable," and, as discussed above, we concur in that assessment. The trial court concluded that any improper argument by Burchell's counsel did not contribute to the verdict. We do not find this conclusion to be plainly wrong, and therefore we will not disturb it.

In sum, FPS has not demonstrated that the jury's award of noneconomic damages was excessive.

C. *Section 998 Offer*

FPS argues that Burchell's section 998 offer was invalid on two alternative bases. First, it is undisputed that the offer was never served on FPS; it was made and expired before FPS ever became a party to the litigation. The trial court concluded that FPS had "agreed to step into the shoes of [LLUHC]" for all purposes, including the consequences of LLUHC's decision not to accept Burchell's section 998 offer. FPS contests this interpretation of the amendment to the complaint that made it a party and the stipulation that FPS would pay "any verdict that becomes final with respect to Mr. Burchell" in exchange for Barker's dismissal. Second, FPS contends that Burchell's section 998 offer was invalid even as to Barker and LLUHC because it was improperly conditioned on acceptance by both parties. Without deciding FPS's first argument, we find that its second argument has merit, and therefore reverse the trial court's award of expert witness fees and prejudgment interest based on the invalid section 998 offer.

Code of Civil Procedure Section 998 establishes a procedure for shifting costs upon a party's refusal to settle by "expand[ing] the number and type of recoverable costs and fees" beyond those otherwise available to a prevailing party under Code of Civil Procedure section 1032, subdivision (b). (*Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 1000.) In addition to expert witness fees, a prevailing plaintiff in a personal injury case may obtain postoffer interest on the judgment. (Civ. Code, § 3291.) The purpose of Code of Civil Procedure section 998 is "to encourage settlement by providing a strong financial disincentive to a party—whether it be a plaintiff or a

25

defendant—who fails to achieve a better result than that party could have achieved by accepting his or her opponent's settlement offer. (This is the stick. The carrot is that by awarding costs to the putative settler the statute provides a financial incentive to make reasonable settlement offers.)" (*Bank of San Pedro v. Superior Court* (1992) 3 Cal.4th 797, 804.) "To qualify for these augmented costs, the plaintiff's offer must be in writing and conform to statutory content requirements." (*Martinez v. Brownco Construction Co.* (2013) 56 Cal.4th 1014, 1019.)

On undisputed facts, we review de novo whether a section 998 offer complies with those statutory requirements. (*Gonzalez v. Lew* (2018) 20 Cal.App.5th 155, 160.) Burchell, as offeror, has the burden of demonstrating that his section 998 offer complied with the statutory content requirements, and we are required to construe the offer strictly in favor of the offeree, FPS. (*Weinberg v. Safeco Ins. Co. of America* (2004) 114 Cal.App.4th 1075, 1086.)

It has "long been held" that, with exceptions not relevant here, a section 998 offer must be "made in a manner allowing individual offerees to accept or reject it." (*Menees v. Andrews* (2004) 122 Cal.App.4th 1540, 1544 (*Menees*); *Wickware v. Tanner* (1997) 53 Cal.App.4th 570, 576) (*Wickware*) ["Even if a [section 998 offer] is allocated among individual defendants, it may not be conditioned on acceptance by all defendants"].) "This rule has been applied to both plaintiff and defendant offerors, and both where the offer is explicitly and impliedly conditioned on joint acceptance by the offerees." (*Menees*, at p. 1544.)

26

In *Menees*, the Court of Appeal concluded that the offer at issue was conditioned on the acceptance of all offerees—in that case, multiple plaintiffs—and therefore invalid, because it "was made in a single document, which referred to [the offerees] in the conjunctive." (*Menees*, *supra*, 122 Cal.App.4th. at p. 1546.) It was accompanied by a notice of acceptance that "again referred to [the offerees] in the conjunctive and, quite tellingly, provided only one signature line—for the attorney who represented both of them." (*Ibid*.) In *Wickware*, the Court of Appeal reached the same conclusion about a similar offer, "a single document addressed to all defendants" that "offers to take judgment only against all defendants and not against one or more of them" and "requires that defendants in the plural, and not any one defendant in the singular, accept the offer." (*Wickware*, *supra*, 53 Cal.App.4th at p. 577.)

Burchell's section 998 offer to Barker and LLUHC is also a single document addressed to both parties, which referred to them in the conjunctive as "Defendants." It offered to take judgment against both Barker and LLUHC together, not against one or the other. The accompanying notice of acceptance, too, referred to both Barker and LLUHC in the conjunctive as "Defendants," and there is only one signature line, for the attorney who represented both of them. There is no meaningful distinction between Burchell's section 998 offer here and those at issue in *Menees* and *Wickware*. It is therefore invalid.

Indeed, the facts here demonstrate why it is generally appropriate to require separate offers, even though Burchell's offer was to hold the Barker and LLUHC jointly liable for the entire settlement amount. LLUHC had plausible defenses to liability not

available to Barker, namely, that it was not in fact Barker's employer and therefore should not be held liable for his actions. By framing the offer to settle in the conjunctive, Burchell made it effectively impossible for either party to accept the offer, even if so inclined, because the offer required an entity that was not responsible for Barker's actions to accept liability.

Burchell has argued that *Steinfeld v. Foote-Goldman Proctologic Medical Group, Inc.* (1996) 50 Cal.App.4th 1542 (*Steinfeld*) and *Bihun v. AT&T Information Systems* (1993) 13 Cal.App.4th 976 (*Bihun*) require a different conclusion. He is mistaken. Both of those cases involve an unapportioned offer to hold multiple defendants joint and severally liable, but both can be read to indicate that the offer was served separately on each defendant. (See *Steinfeld*, *supra*, 50 Cal.App.4th at p. 1545 [offer to compromise "served . . . on both defendants"]; *Bihun*, *supra*, 13 Cal.App.4th at p. 998 [offer made to "defendant AT&T and several of its defendant employees"].) Neither case addresses the issues related to the form of the offer that are the focus of *Menees* and *Wickware*.

Because Burchell's section 998 offer was invalid even as to Barker and LLUHC, it is also invalid as to FPS. The trial court's award of expert witness fees and prejudgment interest on the basis of that offer therefore must be reversed.

## III. DISPOSITION

The judgment is reversed with respect to the award of expert witness fees and prejudgment interest; it is affirmed in all other respects. The matter is remanded for the

trial court to enter a new judgment accordingly.  The parties shall each bear their own costs on appeal.

CERTIFIED FOR PUBLICATION

RAPHAEL
J.

We concur:

MCKINSTER
Acting P. J.

FIELDS
J.